1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

13
14
15
16
17
18
19
20
21
22

| | |
|---|---|
| INTERVENTION911, a California corporation, | ) CASE NO. CV 13-01117 MMM (OPx) )<br>) |
| Plaintiff, | ) ORDER GRANTING IN PART AND<br>) DENYING IN PART DEFENDANT'S<br>) MOTION FOR SUMMARY JUDGMENT |
| vs. | ) |
| CITY OF PALM SPRINGS, a California Charter city, | )<br>) |
| Defendant. | )<br>)<br>) |
| | )<br>)<br>)<br>)<br>)<br>) |

23
24
25
26
27
28

On June 21, 2013, Intervention911 ("Intervention") filed this action against the City of Palm Springs (the "City"), alleging intentional discrimination and failure to make reasonable accommodation claims under the Fair Housing Act, the Americans with Disabilities Act, and the

Fair Employment and Housing Act.[1]  On May 16, 2014, the City filed a motion for summary judgment.[2]  Intervention911 opposes the motion.[3]

## I. BACKGROUND

### A.    The Sober Living Facilities

Ken Seeley founded Intervention in 2001 to perform interventions designed to assist persons suffering from addiction.[4]  In 2011, Intervention expanded its services, and began to offer sober housing environments where no treatment is provided ("Sober Living").  This housing is designed for individuals who have reached the stage in their recovery process where they do not need to be in treatment, rehabilitation, or an assisted living facility.[5]  In November 2011,

--------

[1]Complaint, Docket No. 1 (June 21, 2013), ¶¶ 102-109.

[2]Motion for Summary Judgment ("MSJ"), Docket No. 46 (May 16, 2014).

[3]See also Opposition to Motion for Summary Judgment ("Opposition"), Docket No. 58 (June 16, 2014).

[4]Statement of Uncontroverted Facts ("SUF"), Docket No. 47 (May 16, 2014), ¶ 1; Statement of Genuine Issues ("SGI"), Docket No. 59 (June 16, 2014), ¶ 1.  Intervention disputes this fact in part, as it does many of the City's proposed uncontroverted facts.  The evidence Intervention cites, however, does not controvert the facts cited by the City; rather, it simply provides additional information on the same topic.  As respects this fact, Intervention states that in 2011 it expanded its services and began to provide "Sober Living" housing.  (SGI, ¶ 1.)  This does not controvert the fact that Intervention was founded in 2001 for the purpose of performing interventions.  Where Intervention merely provides additional information concerning a subject, and proffers no evidence controverting the City's proposed fact, the court deems the fact uncontroverted.

[5]SGI, ¶ 1.   The City disputes Intervention's proposed fact, which is based on the declaration of Ken Seeley, but cites no evidence controverting it.  In a document titled "Objections to the Declaration of Ken Seeley," The City states that it objects to the entirety of the declaration of Ethan Loeb on the grounds that it violates Local Rules 11-3.8, 11-5.2, and 11-5.3, and was struck by the clerk on June 17, 2014.  (Objections to the Declaration of Ken Seeley ("Objections to Seeley Decl."), Docket No. 82 (June 23, 2014) at 2.)  This objection, which also appears in the City's objections to the declaration of Ethan Loeb, appears to have been included in the objections to Seeley's declaration in error, as Seeley's declaration has not been stricken and the objection refers to the wrong declarant.  Accordingly, the court disregards this objection.

Intervention began to operate a facility known as The Alexander.  In March 2012, it opened a second facility known as The Palm Tee (collectively "the facilities").[6]  Both facilities are located in Palm Springs.  The facilities can accommodate 19 residents and 33 residents, respectively, including on-site resident managers.[7]

Intervention denominates its Palm Springs properties "Sober Living Homes" designed to help its clients "maintain their sobriety, regain the ability the ability to live independently, . . . enjoy productive lifestyles," and avoid relapse.[8]  It also describes the facilities as "sober living apartments where individuals who are recovering from addiction reside in an alcohol and drug-free environment."[9]  Residents at the facilities pay for the housing monthly, abide by house rules, and work together through social interaction to stay clean, sober, and begin to regain the productive lives they had before succumbing to addiction.[10]  This is accomplished through peer support and a structured environment at the facilities.[11]  The Alexander will only accept women residents,

---

[6]SUF, ¶ 3; SGI, ¶ 3.  See *infra*, note 4.

[7]SUF, ¶ 4; SGI, ¶ 4.

[8]SUF, ¶ 14; SGI, ¶ 14.  See *infra*, note 4.

[9]SGI, ¶ 14.  The City objects to this fact, which is based on Seeley's declaration, on the grounds that it is irrelevant and lacks foundation, that Seeley lacks personal knowledge, that it is an improper legal opinion, and that it is argumentative.  (Reply to Statement of Genuine Issues ("Reply SGI"), Docket No. 76 (June 23, 2014) at 7; Objections to Seeley Decl. at 4.  This fact is probative of the activities that occur at the facilities, which is relevant to Intervention's argument that the facilities were misclassified for zoning purposes.  As Intervention's founder and current co-owner (see SUF, ¶ 2; SGI, ¶ 2), Seeley is in a position to know the facilities' activities.  See *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2001) ("Griesbach's five-year tenure as Arrow's credit manager lends support to his claim of 'personal knowledge' of industry practice"); *Barthelemy v. Air Line Pilots Ass'n.*, 897 F.2d 999, 1018 (9th Cir. 1990).  Finally, the statement does not express a legal opinion, and it is not argumentative.  The City's objections are therefore overruled.

[10]SGI, ¶ 14.  The City raises myriad objections to this fact, which the court overruled.  See note 9, *supra*.

[11]SUF, ¶ 15; SGI, ¶ 15.  Although the City states that the environment is "strictly structured," this is not supported by the evidence it cites.  See (Declaration of Robert L. Kaufman

while The Palm Tee will only accept men.  Residents are subject to numerous rules, including scheduled times for waking, sleeping, and showering.  Showers are limited to 5 to 8 minutes each, with 15 minutes of total shower time per day.  Residents' vehicles must be in good operating condition, and cannot be equipped with modified engines.  Medicine is centrally stored in a locked location.  Residents may not lock their rooms at night; they cannot engage in sexual relations on-site, even if they are married; and children are not permitted on-site, even to visit their parents.[12]  Residents must be students, be employed, or be seeking employment between 8:30 a.m. and 4:30 p.m. on weekdays.  They must also attend 12-step meetings.[13]  Seeley testified that several of the

("Kaufman Decl."), Docket No. 48-1 (May 16, 2014), Exh. A ("Def.'s Seeley Depo.") at 66:19-22 ("Q. Okay.  Some people need a more structured environment of sober living and some do not in order to get through the recovery process.  Am I right?  A. Yes").

[12]SUF, ¶ 17; SGI, ¶ 17.  Intervention objects to the City's assertion that medicine is distributed by its staff.  This proposed fact is not supported by the evidence the City cites.  Intervention also objects that the rules prohibiting visits by minors and limiting shower time are not consistently enforced.  This fact, which the court discusses *infra* (see notes 14-15 and accompanying text), does not controvert the fact that Intervention has the house rules the City identifies.

[13]SUF, ¶ 16.  The City cites the schedule posted on Intervention's website and listed in its house rules, and contends these constitute admissions.  (Kaufman Decl., Exhs. C, D; Reply SGI at 8-9.)  Intervention disputes the proposed fact; it asserts it provides only a suggested schedule that has never been implemented.  Intervention further contends that "[w]hen asked about the schedule at deposition, residents had either never seen the schedule or explained that they in fact are free to schedule their day." (SGI, ¶ 16.)  Intervention does not cite the testimony of any resident, however.  Instead, it cites Seeley's deposition, which does not support its contentions.  Seeley does not state the schedule is optional or that it has never been implemented.  Nor does he discuss whether residents are aware of the policy.  (Declaration of Ethan J. Loeb ("Loeb Decl."), Docket No. 68 (June 17, 2014), Exh. AM ("Pl. Seeley Depo.") at 138:18-139:2; 160:11-161:1; 130:7-21; 168:11-169:22.  He states that the rule requiring unemployed residents to seek work is no longer enforced.  See *id.* at 160:11-161:1 ("Q. Okay. You see on the next page there, the second-from-the-last – or third-from-the-last, whichever way you want to phrase it – miscellaneous items.  It starts, 'Those not employed.'  Do you see that?  A. Yes.  Q. 'Those not employed or in school, will leave the house each weekday from 8:30 a.m.' – and does that mean to continue to be absent until 4:30 p.m.?  A. I think that was an old one. I don't think they have that anymore.  Q. That's still in the contract here, isn't it?  A. Yeah, but I don't – I think it was more of a motivator to get them out looking for a job or volunteering, but I don't think any of the house managers hold them accountable to that one").  Seeley does not, however, state that the other rules

1   rules are not consistently enforced.  He stated that "a 15-year-old-son" would "absolutely" be

2   permitted to visit his father at the facility even if unaccompanied by his mother.[14]  He also asserted

3   that Intervention has no means of enforcing the rule limiting shower time.[15]   Residents at the

4   facilities agree that they will leave the premises immediately if asked to do so, and that they will

5   forfeit their paid contributions if they leave without notice or are asked to leave due to failure to

6   maintain sobriety or violation of the housing agreement.[16]

7        Intervention's website advertises various services available to residents, including nutrition

8   planning, fitness, education, hypnosis, and life skills; it does not specify whether these services

9   are provided on or off site, however.[17]  The website also advertises other services, including, *inter*

10  *alia*, drug testing, medication oversight, and equine therapy, which are provided only off site by

11  community providers.[18]  Seeley testified that "The Alexander and Palm Tee are not institutions

12  where individuals go to receive treatment, interventions, life skills courses, or medical care."[19]

13  Dianne B., a resident at The Alexander, testified that she has not had any life skill courses at the

14  facility, and that it is "basically just the house where I live."[20]  Seeley asserted that nutrition

15

16

17

18  have not been implemented or that residents are unaware of them.  Accordingly, the court deems
    the City's fact uncontroverted.  The City objects to Seeley's testimony concerning the residents'
19  knowledge as speculative, lacking foundation, and hearsay.  Because Intervention does not actually
    cite any testimony in which Seeley describes residents' knowledge, the court need not address this
20  evidentiary objection.

21       [14]SGI, ¶ 17; Pl. Seeley Depo. at 143:11-20.

22
         [15]SGI, ¶ 17; Pl. Seeley Depo. at 154:7-14.
23
         [16]Kaufman Decl., Exh. F.
24
25       [17]*Id.*, Exh. E.

26       [18]*Id.*

27       [19]Seeley Decl., ¶ 7.

28       [20]Deposition of Dianne B., Docket No. 68-16 (June 17, 2014) at 78:11-17.

5

services are provided only off site,[21] and that "no treatment or therapy was occurring at either site."[22]

### B.   Community Opposition to the Facilities

In late 2011, Intervention held an open house for neighbors of The Alexander.[23] Following the open house, neighbors of the facilities lodged complaints with the City concerning the use of the properties as sober living facilities.[24]   Although some complaints focused on traffic and noise generated by the facility, most concerned the residents, and the fact that they would bring drug dealers into the area, and promote gang activities and increased crime.[25]   Nadine Fieger, a Code

---

[21]Declaration of Ken Seeley ("Pl. Seeley Depo."), Docket No. 60 (June 16, 2014) at 169:23-170:21; 174:16-175:19.   Although Intervention asserts that it does not provide onsite nutrition planning, fitness, education, hypnosis, or life skills classes (SGI, ¶ 18), it cites no evidence supporting its contention that fitness, education, and life skills services are not available onsite.

[22]Seeley Decl., ¶ 12.   See Pl. Seeley Depo. at 97:5-15 (("Q. What does the facility do for them, as opposed to their peers, other than provide a bed? A. Provides them utilities, TV, and internet.   Q. Well, isn't that included, though, in the price they pay for the – what you call a contribution amount?   A. Correct.   Q. Okay. So there's a bed and utilities. Yes?   A. Yes.   Q. Anything else?   A. No").

[23]SGI, Plaintiff's Fact #1.

[24]*Id.*

[25]*Id.*   Intervention cites letters and emails sent to the City by residents concerning the facilities, which are attached to the declaration of Ethan Loeb.   (Declaration of Ethan J. Loeb ("Loeb Decl."), Docket No. 68 (June 17, 2014), Exhs. E, F.)   The City objects to the entirety of Loeb's declaration on the grounds that it fails to comply with Local Rules 11-3.8, 11-5.2, and 11-5.3.   (Objections to the Declaration of Ethan Loeb ("Objections to Loeb Decl."), Docket No. 78 (June 23, 2014) at 2.)   Local Rule 11-3.8 requires, *inter alia*, that each document filed with the court include a title page.   CA CD L.R. 11-3.8.   Local Rule 11-5.2 requires that exhibits be consecutively numbered, and Local Rule 11-5.3 requires the use of exhibit numbers.   CA CD L.R.s 11-5.2, 11-5.3.   On June 16, 2014, Intervention filed the declarations of Ethan Loeb, James Christensen, James Cioffi, Harry Harountunian, and Andrew Wainright; the clerk struck the declarations on June 17, 2014 for failure to comply with Local Rules 11-3.8, 11-5.3, and 11-5.2. (See Docket Nos. 61-67.)   On June 17, 2014, plaintiff refiled the declarations.   (See Docket Nos. 68-72.)   The city asserts the June 17 declarations are untimely, and should be disregarded under Local Rules 7-12 and 7-13.   (Objections to Loeb Decl. at 2.)   Rule 5(d)(4) of the Federal Rules of Civil

Procedure provides that "[t]he clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice." FED.R.CIV.PROC. 5(d)(4).  See *Klemm v. Astrue*, 543 F.3d 1139, 1143 (9th Cir. 2008) (holding that the clerk was obligated to accept appellant's notice of appeal for filing, even though it failed to comply with local filing rules, citing FED.R.CIV.PROC. 5(d)(4)); *MD Propertyco, LLC v. Mad Dog Saloon AZ, L.L.C.*, No. CV–12–2516–PHX–LOA, 2012 WL 5984950, *3 (D. Ariz. Nov. 28, 2012) ("[T]he Clerk of Court is not authorized to strike a non-conforming pleading or filing," citing FED.R.CIV.PROC. 5(d)(4)); *Zepeda v. Walker*, 564 F.Supp.2d 1179, 1183 (C.D. Cal. 2008) ("[A] pleading may be deemed filed even if the pleading is not in compliance with filing rules," citing *Ordonez v. Johnson*, 254 F.3d 814, 816 (9th Cir. 2001) ("We have previously held that a complaint is filed when it is placed in the actual or constructive custody of the clerk [of the court], despite any subsequent rejection by [the clerk] of the pleading for non-compliance with a provision of the local rules" (internal quotation omitted; alterations original), and *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)).  Accordingly, Intervention's declarations are deemed to have been filed on June 16, 2014, the date they were first submitted.  The declarations are thus timely and the court will consider them.

The City also objects on relevance, foundation, and hearsay grounds.  (Reply to Statement of Genuine Issues ("Reply SGI"), Docket No. 76 (June 23, 2014) at 42; Objections to Loeb Decl. Nos. 2, 3.)  It argues that evidence of community animus is not relevant to Intervention's discrimination claims absent evidence that the City actually relied on the complaints in making its decision.  (Reply SGI at 42.)  While it is true that the letters and emails from community members do not prove that the City discriminated against Intervention, they are nonetheless probative of animus within the community, which may provide circumstantial evidence of discrimination by the City.  The communications thus pass the low relevance bar set by the Federal Rules of Evidence.  See *United States v. Whitmore*, 944 F.Supp.2d 1003, 1006 (D. Nev. 2013) ("[E]vidence is relevant if it tends to prove the point for which it is offered and if that point matters to the case," citing FED.R.EVID. 401 Advisory Committee Notes); see also *United States v. Oliver*, 45 Fed. Appx.659, 661 (9th Cir. Aug. 22, 2002) (Unpub. Disp.) (evidence does "not have to prove the entire case.  Evidence is sufficiently probative if it supplies even a small piece of the puzzle"); FED.R.EVID. 401 (evidence is relevant if it has "any tendency to make the existence of any fact . . . more or less likely that it would be without the evidence").  As respects the City's foundation objection, the letters were written by members of the community who expressed personal opinions regarding the presence of the facilities in their neighborhood.  The letters' authors have personal knowledge of their own opinions.  To the extent the City asserts that Loeb cannot authenticate the letters, because he is neither an author or recipient of them, see *Orr v. Bank of America*, 285 F.3d 764, 777 (9th Cir. 2002), it should have made an authentication objection.  Even if the court assumes such an objection was made, the documents appear to have been produced during discovery by the City, given that they bear Bate stamp numbers preceded by PS in the lower right hand corner.  Documents produced during discovery are deemed authentic when offered by the party-opponent.  See *Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n. 12 (9th Cir. 1996).  Finally, the letters are not hearsay because they are not offered for the truth of the matters asserted, but merely as evidence of community

1   Compliance Officer with the Palm Springs Department of Building & Safety, described the general

2   neighborhood reaction as "oh, my God, Martians have landed in the neighborhood. . . ."[26]

3         The Deepwell Estates Neighborhood Association ("DENO") soon commenced an

4   aggressive "NIMBY" (Not In My Backyard) campaign aimed at the facilities.   DENO gave its

5   members regular updates concerning Intervention's status and complained to City staff and elected

6   officials in an effort to induce them to take action against Intervention.[27]   DENO's chairperson sent

7   an email to city officials that expressed concerns about crime and other issues, and urged the City

8   Council to "take into account the feelings of the Deepwell community."[28]   Elected officials and

---

animus toward the facilities' residents.  The court therefore overrules the City's objections.

[26]SGI, Plaintiff's Fact #2.  The City objects that the evidence is not relevant, and that the testimony speaks for itself.  (Reply SGI at 43-44.)  The evidence is relevant because it is probative of discriminatory animus among community members.   The court therefore overrules the relevance objection.  The court overrules the second objection because the City does not assert that Intervention misquotes or otherwise misrepresents Fieger's testimony.

[27]SGI, Plaintiff's Fact # 3.  The City objects that this fact is not relevant.  (Reply SGI at 44-45; Objections to Loeb Decl. No. 6.)  It is relevant, however, because it is probative of the communication to city officials of community members' concerns that reflect discriminatory animus.  The City also objects to the email written by DENO's Chairperson to the City Manager on the additional ground that it lacks foundation.  (Objections to Loeb Decl. No. 6.)  The court overrules the foundation objection because the email expresses the author's personal concerns, a topic within his personal knowledge.  To the extent the objection is directed to Loeb's ability to authenticate the document, the court notes that this document too appears to have been produced by the City during discovery; it is thus adequately authenticated.  The court overrules the hearsay objection because the email is not being offered for the truth of the matter asserted (for example, that the Intervention facilities "bring up many legitimate questions about crime, traffic, and noise"), but rather to show that the DENO chairman communicated such views to city officials.  The chairman's statement urging the City Council to "take into account the feelings of the Deepwell community" is offered not to show that DENO in fact wanted its concerns taken into account, but rather for its effect on the listener.  See *United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991) (applying this exception to the hearsay rule).

[28]SGI, Plaintiff's Fact #4.  The City objects to this evidence, which the court has already overruled.  See note 27, *supra*.

the city manager requested status updates from City staff concerning Intervention's operations.[29] Craig Ewing, the City's planning director, testified that the emails he sent to city elected officials in response to their inquiries were "out of the norm" when compared with dozens of other CUPs he had processed during his career with the City.[30]  Ewing characterized the neighbors' complaints as "NIMBY."[31]

---

[29]SGI, Plaintiff's Facts #5, 6; Loeb Decl., Exh. J at 128:23-131:17, 135:3-136:25. Intervention cites emails among City officials, as well as Ewing's deposition testimony.  The City objects on relevance, foundation, and hearsay grounds.  (Reply SGI at 45-46; Objections to Loeb Decl. Nos. 4-6.)  The evidence is probative of City officials' awareness of and attention to city residents' concerns about the facilities, and provides circumstantial evidence of discrimination by the City.  The court overrules the hearsay objection to the emails because they are not offered for the truth of the matter asserted.  The court overrules the hearsay objection to the deposition testimony because such testimony could be introduced in a form that would be admissible at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents").  The court overrules the foundation objection because the authors are discussing issues within their personal knowledge.

[30]SGI, Plaintiff's Fact #7; Loeb Decl., Exh. J at 128:23-131:17.  The City objects that Ewing's deposition testimony is irrelevant, lacks foundation, and is hearsay.  (SGI Reply at 46-47).  The court overrules the relevance objection because the unusual nature of the City officials' involvement constitutes circumstantial evidence of discrimination.  The court overrules the hearsay objection because the cited testimony could be produced in admissible form at trial.  *Fraser*, 342 F.3d at 1036.  The court overrules the foundation objection because, as planning director, Ewing has personal knowledge of the level of prior inquiries by City officials to his department.

[31]SGI, Plaintiff's Fact #8.  The City objects that Ewing's testimony is irrelevant, lacks foundation, and is hearsay.  (SGI Reply at 47.)  The evidence is probative of community attitudes concerning the facilities, and therefore relevant.  As planning director, Ewing has personal knowledge of complaints received by his office.  Finally, Ewing's deposition testimony could be produced in admissible form at trial by calling him as a witness.  *Fraser*, 342 F.3d at 1036.  The court therefore overrules the City's objections.

## C.    Relevant Sections of the Palm Springs Zoning Code

The Alexander is located on land zoned R2 pursuant to the Palm Springs Zoning Code.[32] The Palm Teeis located on land zoned for R2 and R3 uses.[33]  R2 zones are "intended to provide for the development of medium-density multiple-family residential uses."[34]   Single-family dwellings, multiple family dwellings, and hotels are permissible uses allowed as a matter of right on land zoned R2; other uses, such as assisted living facilities, must obtain a conditional use permit ("CUP").[35]  R3 zones are "intended to provide for the development of high density apartments, hotels and similar permanent and resort housing and certain limited commercial uses directly related to the housing facilities."[36]  In R3 zones, multiple-family dwellings and hotel facilities in which no more than 10 percent of the guest rooms contain kitchen facilities are permissible and allowed as a matter of right; other uses, including assisted living facilities, must obtain a CUP.[37]

Section 91.00.10(B) defines an "assisted living facility" as

"a special combination of housing, supportive services, personalized assistance and health care licensed and designed to respond to the individual needs of those who need help with activities of daily living and instrumental activities of daily living. Supportive services are available twenty-four (24) hours a day to meet scheduled and unscheduled needs in a way that promotes maximum dignity and independence for each resident and involves the resident's family, neighbors and friends, and

---

[32]SUF, ¶ 5; SGI, ¶ 5.

[33]SUF, ¶ 6; SGI, ¶ 6.

[34]SUF, ¶ 7; SGI, ¶ 7; Palm Springs Zoning Code § 92.03.00.

[35]Palm Springs Municipal Code § 92.03.01.

[36]SUF, ¶ 9; SGI, ¶ 9; Palm Springs Municipal Code § 92.04.00,

[37]Palm Springs Municipal Code § 92.04.01.

1    professional caretakers."[38]

2    A "hotel" is defined as

> "any building or portion thereof containing six (6) or more guest rooms used by six
> (6) or more guests, for compensation (excepting jails and hospitals), where
> provision for cooking may be made in a limited number of individual suites, and
> which rooms are designed and intended as temporary or overnight
> accommodations."[39]

8    The code defines "multiple-family dwelling" as "a building designed for or occupied by two (2)

9    or more families living independently of each other."[40]   Where a facility does not fit neatly into

10   any existing category, the code grants the Planning Director authority to determine its

11   classification.[41]

### D.   Enforcement Actions Against the Facilities

13   On April 12, 2012, Code Compliance Officer Fieger visited the properties and spoke with

14   Seeley and Eric McLaughlin, who co-owns Intervention with Seeley.  Seeley and McLaughlin told

15   Fieger that no treatment or therapy was provided at either site, and thus no state license was

16   required.[42]   Later that day, the City sent Intervention a letter stating that it would be required to

17   obtain a CUP for both The Alexander and The Palm Tee, which had yet to open, to operate as

18   assisted living facilities, and that applications should be submitted no later than May 1, 2012.[43]

---

[38]SUF, ¶ 11; SGI, ¶ 11; Palm Springs Municipal Code 91.00.10(B).

[39]SUF, ¶ 12; SGI, ¶ 12; Palm Springs Municipal Code 91.00.10(B).

[40]Palm Spring Municipal Code § 91.00.10(B).

[41]Kaufman Decl., Exh. L; Palm Spring Zoning Code § 91.00.08(B) ("Conflicting or Ambiguous Provisions.  In any case where there may be conflicting or ambiguous provisions within this Zoning Code, the director of planning and building, or his authorized representative, shall determine the applicability of such provisions.  Such determination may be appealed to the planning commission").

[42]SGI, ¶ 22.

[43]SUF, ¶ 22; SGI, ¶ 22.  See note 4, *supra*.

On May 3, 2012, the City formally notified Intervention that The Alexander was operating as an assisted living facility without a CUP in violation of Palm Springs Zoning Ordinance § 92.03.01(C)(2),[44] and that the City had identified the facility as a public nuisance.[45]  The notice stated that failure to correct the violation might result in an administrative citation carrying a fine of $100 per violation, that subsequent citations would carry higher fines, and that the City might charge Intervention for staff time and related costs necessary to obtain compliance with the notice.[46]

On June 25, 2012, Intervention filed CUP applications for both facilities.[47]  The City sought additional information from Intervention concerning the applications, which Intervention provided.[48]  The City ultimately notified Intervention that it could not recommend approval of the CUP applications, because operating The Alexander and Palm Teeas assisted living facilities was "inconsistent with the General Plan since it [was] not a hotel/tourist related use."[49]  City staff directed Intervention to convert its CUP applications to applications for a Planned Development District ("PDD") permit if it wished to continue to operate the facilities as sober housing facilities.[50]  Intervention withdrew the CUP applications,[51] and sent the City a letter stating that the facilities should be treated as "hotels" rather than "assisted living."[52]  This would have permitted the facilities to operate by right under the zoning code.

---

[44]SUF, ¶ 23; SGI, ¶ 23.

[45]Seeley Decl., Exh. B.

[46]Id.

[47]SUF, ¶ 24; SGI, ¶ 24.

[48]SUF, ¶ 25; SGI, ¶ 25.  See note 4, *supra*.

[49]SGI, ¶ 25.

[50]Id.

[51]Id.

[52]SUF, ¶ 26; SGI, ¶ 26.  See note 4, *supra*.

On November 1, 2012, Ewing sent a letter to Seeley and McLaughlin stating that the Alexander and Palm Tee were assisted living facilities and could not be considered hotels.[53] He stated that, based on information gleaned from Intervention's CUP applications, marketing brochures, website, and statements by its attorneys, the facilities "are operated as a collection of semi-private rooms with multiple contracts per room . . . held by unrelated persons with accommodations, programming, counseling, and services for treating addiction recovery." He advised that the City had determined the facilities did not fit the definition of a "hotel," and that they were instead substance abuse recovery centers or sober living facilities.[54] Ewing asserted that "[i]t ha[d] been the City's long-standing determination that substance abuse recovery centers [were] classified as 'assisted living facilities' and therefore subject to a Conditional Use Permit in the underlying R-2 and R-3 zones that appl[ied] to [Intervention's] properties."[55] As a result, he concluded, Intervention was operating non-permitted sober living facilities/substance abuse recovery centers in violation of the zoning code, and had either to cease operations immediately or refile CUP applications seeking approval as PDDs and obtain business licenses listing the business type as "substance abuse recovery center / sober living facility."[56]

On December 10, 2012, Intervention sought reconsideration of Ewing's decision by the City Planning Commission.[57] On December 12, 2012, Planning Director Ewing submitted a report to the Planning Commission, which recommended a finding that, under the Zoning Code, the facilities were "assisted living facilities" rather than "hotels"[58] The recommendation was based, *inter alia*, on Intervention's CUP applications, marketing materials, website, and plans for

---

[53]SGI, ¶ 26.

[54]Kaufman Decl., Exh. L.

[55]*Id.*

[56]*Id.*

[57]SUF, ¶ 30; SGI, ¶ 30.

[58]SUF, ¶ 31; SGI, ¶ 31.

1   onsite treatment, counseling, life skills classes, twelve-step meetings, medication management,

2   and medical services.[59]  Intervention was not providing the onsite services at that time, but

3   explained in its CUP applications that it planned to offer them once granted a CUP permit to

4   operate assisted living facilities.[60]  The Planning Commission continued the hearing and directed

5   staff to work with Intervention "on issues relating to zoning and building requirements. . . ."  It

6   also "direct[ed] staff to provide further investigation on the changes made on-site, as indicated by

7   the applicant."[61]

8        On December 26, 2012, the City Fire Department (PSFD) reclassified The Alexander and

9   Palm Tee under the State Building and Fire Codes.[62]  In reaching this decision, PSFD cited, *inter*

10  *alia*, the facilities' intention to provide services for clients "in the form of: 24/7 support services;

11  nurse/doctor assisted medication management; counseling services, etc.," in addition to

12  supervision and personal care services.[63]  It noted that "[w]hen evaluating a potential change of

13  use occurring at an existing occupancy, the . . . [PSFD] will assess the intended use of the new

14  occupant and compare the intended use with that of the previous occupant, as well as the existing

15  occupancy group classification[.]"[64]  The PSFD concluded that the Palm intended use to which

16  Intervention wished to put The Palm Tee required reclassification from R-1, which permits

17  _____

18      [59]SUF, ¶ 32; SGI, ¶ 32.  See note 4, *supra*.

19      [60]SGI, ¶ 32.  The City objects that this evidence is irrelevant.  (Objections to Seeley Decl.
20  at 6.)  The evidence is probative of the services Intervention was providing at the facilities at the
    time the CUP applications were denied, and is therefore relevant in assessing whether the facilities
21  were misclassified under the zoning code.  The City's objection is therefore overruled.

22      [61]SUF, ¶ 33 (quoting Kaufman Decl., Exh. O (12/12/12 Planning Commission Meeting
23  Minutes), ¶ 16; SGI, ¶ 33.

24      [62]Kaufman Decl., Exh. P.  Under the Building Code, "[w]here a structure is proposed for a
    purpose that is not specifically provided for in this code, such structure shall be classified in the group
25  that the occupancy most nearly resembles, according to the fire safety and relative hazard involved."
26  (*Id.*;  California Building Code, Chapter 3, § 302.1 (2010).)

27      [63]*Id.*

28      [64]*Id.*

"transient" occupancy defined as 30 days or less, to R-4, which includes alcoholism or drug abuse recovery or treatment facilities.[65]   The PSFD reclassified The Alexander from R-2, defined as "residential occupancies containing sleeping units of more than two dwelling units where the occupants are primarily permanent in nature," to R-2.1, which includes alcoholism or drug abuse recovery or treatment facilities.[66]   The PSFD observed that under the 2010 California Fire Code, Division II, § 102.3, "[n]o change shall be made in the use or occupancy of any structure that would place the structure in a different division of the same group or occupancy or in a different group of occupancies, unless such structure is made to comply with the requirements of this code, and the International Building Code."[67]   The PFSD stated that a fire code official has authority to waive compliance with current fire code requirements if he determines that the proposed change of use will result in a "less hazardous" use than the existing use.[68]   It concluded, however, that there was "no argument supporting any proposition that the occupants of an alcohol/drug abuse recovery facility represent a potential life safety or fire hazard, that would be considered less than, or even equal to, the general population of a hotel, or apartment building."[69]   As a result of the

---

[65]*Id.*   See 3 CAL. BUILDING CODE § 310.1 – R-4 (2010) ("Residential occupancies shall include buildings arranged for occupancy as residential care/assisted living facilities including more than six-ambulatory clients, excluding staff").

[66]*Id.*   See 3 CAL. BUILDING CODE, § 310.1 – R-2.1 (2010) ("This occupancy shall include buildings, structures or parts thereof housing clients, on a 24-hour basis, who because of age, mental disability or other reasons, live in a supervised residential environment that provides personal care services").

[67]*Id.*   The California Code of Regulations defines "Alcoholism or Drug Abuse Recovery or Treatment Facility" as any facility, building or group of buildings which is maintained and operated to provide 24-hour residential non-medical alcoholism or drug abuse recovery or treatment services." 9 CAL. CODE REGS. § 10501(a)(6).   It defines "Alcoholism or Drug Abuse Recovery or Treatment Service" as "a service which is designed to promote treatment and maintain recovery from alcohol or drug problems which includes one or more of the following: detoxification, group sessions, individual sessions, educational sessions, and/or alcoholism or drug abuse recovery or treatment planning." 9 CAL. CODE REGS. § 10501(a)(5).

[68]*Id.*

[69]*Id.*

reclassification, the PSFD stated that Intervention would have to install automatic fire sprinkler systems and fire alarm and detection systems.[70]

Intervention did not appeal the PSFD's determination to the State Fire Marshal.[71]  It did, however, send several letters to Ewing requesting reasonable accommodations in the form of waiver of the requirement that it obtain CUPs and upgrade life safety systems.[72]  On January 22, 2013, Intervention sent Ewing a letter requesting, as an accommodation, that the City treat the facilities as multi-family use, obviating the need to obtain CUPs.[73]  The letter also requested, as an accommodation, that Intervention be permitted to forego upgrading its life safety systems and to continue using the existing system.[74]  On January 23, 2013, Intervention sent a letter to Ewing requesting a continuance of Seeley's appeal of the Planning Director's zoning determination, which was on the Planning Commission agenda that day.[75]  The letter also requested an opportunity to work with the Fire Marshal on the issues identified in the December 26 memorandum.[76]

The  January 23, 2013 Planning Commission Staff Report stated that the current uses and activities at the properties constituted a "change of use" to a more hazardous use occupancy classification, and that the installation of fire alarms and sprinklers at the sites was mandatory.[77]  The report stated that compliance with the state Building Code, and with fire and life safety codes,

---

[70]*Id.*

[71]SUF, ¶ 35; SGI, ¶ 35.  See note 4, *supra*.

[72]Seeley Decl., Exhs. E-G.  A fourth letter, sent April 3, 2013, requested as a reasonable accommodation leaving the zoning designation of the properties unchanged.  It does not reference the prior request regarding the fire suppression system, however.  (*Id.*, Exh. D.)

[73]Kaufman Decl., Exh. R.

[74]*Id.*

[75]Kaufman Decl., Exhs. Q, T.

[76]Kaufman Decl., Exh. Q.

[77]Kaufman Decl., Exh. S.

was independent of local zoning and land use regulations.[78]   With respect to local zoning regulations, the report recommended affirming the Planning Director's decision that the buildings were best classified as assisted living facilities.[79]   The Planning Commission did not act, and continued the matter to February 13, 2013.[80]

On February 5, 2013, Intervention wrote a letter to Ewing asking that the Planning Commission continue the appeal from February 13 to March 6, 2013.[81]   The letter stated that the parties were at an impasse regarding the facilities' classification as "alcohol or drug recovery or treatment facilities" under the state Fire Code.[82]   The letter also indicated that Intervention intended to submit a revised business model to the Planning Commission that would be similar to that of a traditional hotel, so that it could obtain business licenses to operate the properties and avoid the need to displace residents.[83]

On February 13, 2013, the Planning Commission staff issued a report that noted Intervention's noncompliance with the California Building Code.[84]   The report stated that the Commission had sufficient information to rule on the appeal, and recommended classifying the properties as assisted living facilities.[85]   Several residents testified at the Planning Commission meeting, one of whom objected to the facilities on the basis of their clientele:

"I . . . just want to reiterate my objection to them being here because [of] my own experience. My nephew's in a kind of recovery home in L.A. and just two days

[78]SUF, ¶ 38; SGI, ¶ 38.  See also Kaufman Decl., Exh. S.

[79]SUF, ¶ 38; SGI, ¶ 38.  See also Kaufman Decl., Exh. S.

[80]SUF, ¶ 39; SGI, ¶ 39.

[81]Kaufman Decl., Exh. U.

[82]*Id.*

[83]*Id.*

[84]SUF, ¶ 41; SGI, ¶ 41.

[85]SUF, ¶ 41; SGI, ¶ 41.

ago, we had some contact with him.  The County gave him a letter to get some ID from the DMV [be]cause he doesn't have any more driver's license and he need[ed] $7.00.  We gave him $7.00 – what he do – [he took] that money and bought some alcohol with it.  So I'm, you know, we have so much crime in our neighborhood and this on top of it – we have now [to] look all motels in our neighborhood – we don't want to make this a rehab place and the whole neighborhood.  This is supposed to be a retirement community – I came here to retire and so that's why I do want to retire and try to protect our neighborhood as best as possible."[86]

Residents of the facilities also testified regarding the benefits of their living situation.[87]  Seeley testified that "we're not a hotel.  We're not a treatment center.  We're a sober living facility[.]"[88]  Jim Webb, the City's Deputy Chief and Fire Marshal, testified that the "hazard[s] relate[ ] to several factors[:]. . . the occupancy and the occupants and the use of the occupancy, the size, the structure, and so on. . . .  In terms of this occupancy . . . it's alcohol recovery or treatment, and [that] is really the basis of our decision."[89]  The Commission voted 6 to 1 to uphold the Planning

---

[86]Kaufman Decl., Exh. W at 2:16-3:1.  Intervention asserts that "the Planning Commission had before it [a] . . . high volume of neighbor complaints in the file, including those based on discriminatory stereotypes."  (SGI, ¶ 42.)  It cites the December 12, 2013 Planning Commission Staff Report, which lists attachments including "Public Comment letters on the applicant/ appellant's original CUP application."  This document, however, does not include copies of the letters, nor does it provide any information regarding their contents or authors.  Consequently, Intervention's assertion is not supported by the evidence it cites.

[87]SUF, ¶ 43; SGI, ¶ 43.

[88]SUF, ¶ 44; SGI, 44; Kaufman Decl., Exh. W. at 5:16-18.  See note 4, *supra*.

[89]Kaufman Decl., Exh. W at 8:20-9:1.

Director's decision "denying the right of hotel status application."[90]   Intervention appealed the vote to the City Council.[91]

On April 3, 2013, Intevention sent a letter to the City Council requesting, as a reasonable accommodation, that the City recognize there had been no change in use at the facilities under the Zoning Code.[92]   The letter stated that Intervention had received no response to its prior requests for reasonable accommodation.[93]   It asked that, in the alternative, the City treat the use of the properties as "multi family residential uses and . . . the residents' use of the individual units as residential uses."[94]   Later that day, the City Council heard and denied Intervention's appeal and request for reasonable accommodation.[95]   Councilmember Foat stated:

> ". . . I think what we've been trying to do here is put a square peg in a round hole because I don't understand how – I can understand some of the concerns of the neighborhood.  I do not – and I was really upset with – with a letter that was in our packet and I'm gonna read you part of it because this was something that was referred to earlier.  'Many residents of Smoketree are senior citizens and find it frightening to say the least to have recovering addicts located across the street from our residences much less to have them use the grocery facilities, which many of us

---

[90]SUF, ¶ 46; SGI, ¶ 46; Kaufman Decl., Exh. W at 18:1-4.  The City asserts that the Commission based its decision in large part on the potential parking impact of the facilities.  The testimony it cites, however, does not detail the Commissioners' reasons for voting as they did.  Consequently, the City's assertion is unsupported by the evidence it cites.

[91]Seeley Decl., ¶ 21.

[92]Kaufman Decl., Exh. X.

[93]Id.

[94]Id.

[95]SUF, ¶ 48; SGI, ¶ 48; Seeley Decl., ¶ 21.  The City objects to Seeley's statement that the City Council "refused to grant Intervention the reasonable accommodations requested," asserting that the term "reasonable" is irrelevant, lacks foundation, constitutes an improper legal opinion, and is argumentative.  (Objections to Sealey Decl., No. 19.)  These objections are not well taken and are overruled.

walk to often.  This is just not safe.'  I was so disgusted by that that I am almost willing to just allow this to happen.  But I – I – I do understand that there is concern. People who have not had the opportunity to be around recovery – people in recovery, don't understand how difficult it is and what a difficult time it is and – and that it is a – a– a disease.  Addiction is a disease and so I – I would agree that we need to do something to make sure that there is some sort of regulation because I'm not – I'm not content to say that every recovering addict is a wonderful person because that's not true either.  And so I think there are some regulations that are required."[96]

Only one neighborhood resident spoke at the meeting, and made positive comments about those who lived in the facilities.[97]

The City Council acknowledged that neither the "hotel" nor the "assisted living facility" designation was a perfect match for the facilities.[98]   It voted unanimously, however, to uphold the Planning Commission's decision.[99]  The Council found that although Intervention would have to reapply for CUPs, it would not have to pay a second application fee.[100]  The City did not withdraw either the May 3 letter identifying the facilities as a public nuisance and warning of fines

---

[96]Kaufman Decl., Exh. Z at 16:1-14.

[97]SUF, ¶ 52; SGI, ¶ 52; Kaufman Decl., Exh. Z at 11:10-20.  Intervention asserts that the Councilmembers had before them a "high volume of neighbor complaints in the file based on discriminatory animus and stereotypes."  (SGI, ¶ 52.)  It cites the City Council Staff Report, which lists "[a]ttachments" including "Public Comment letters on the applicant/applicant's original CUP application."  (Loeb Decl., Exh. AI at 16.)  The report does not discuss the letters' contents or authors, however, and the court is unable to find that Intervention's statement is supported by the evidence.

[98]SUF, ¶ 54; SGI, ¶ 54.

[99]SUF, ¶ 55; SGI, ¶ 55.

[100]Kaufman Decl., Exh. Z at 18:12-19:13.

1    and other costs, or the November 1 letter from Ewing warning of legal action if Intervention did

2    not immediately reactivate its CUP applications and obtain business licenses.[101]

3         Intervention contends that it has been treated differently than other sober living facilities

4    in Palm Springs.  It contends that the City has issued business licenses to other sober living

5    apartments, allowing them to operate without a conditional use permit.  The City has also

6    allegedly issued building permits and fire inspection approvals for such facilities that do not

7    require upgrades to the fire safety systems.[102]   Like Intervention's facilities, these facilities

8

9    _____

     [101]SGI, ¶ 56.  The City objects that this fact is irrelevant because there was no requirement
10   that the letters be withdrawn, no subsequent action has been taken against Intervention, and the
     City gave assurances at the Council meeting that were video-recorded, such that the City cannot
11   in good faith renege on them.  (Reply SGI No. 56.)  The City does not identify the "assurances"
     to which it refers; based on the context of the cited portion of the transcript, it appears to reference
12   the City Council's decision that Intervention would not be required to pay a second fee to refile
     its CUP applications.  The fact that the City did not withdraw the warning letters is probative of
13   Intervention's claims that the City made discriminatory zoning decisions and retaliated against
14   Intervention for exercising its rights.  The objection is therefore overruled.

15
     [102]SGI, Plaintiff's Fact #12.  This proposed fact is based on the expert opinion of James
16   Cioffi.  The City objects to the entirety of Cioffi's declaration under Rule 26(a)(2)(B) of the
     Federal Rules of Civil Procedure.  Rule 26(a)(2) "requires parties to disclose the identity of any
17   expert witness."  FED.R.CIV.PROC. 26(a)(2); *Goodman v. Staples The Office Superstore, LLC*,
     644 F.3d 817, 824 (9th Cir. 2011).  Rule 26(a)(2)(B) requires that the disclosure include a
18   detailed, written expert report "if the witness is one retained or specially employed to provide
     expert testimony in the case."  FED.R.CIV.PROC. 26(a)(2)(B).  The report must include "(I) a
19   complete statement of all opinions the witness will express and the basis and reasons for them; (ii)
20   the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to
     summarize or support them; (iv) the witness's qualifications, including a list of all publications
21   authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4
22   years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the
     compensation to be paid for the study and testimony in the case."  FED.R.CIV.PROC. 26(a)(2)(B).
23   While "[t]he purpose of an expert report is 'not to replicate every word that the expert might say
24   on the stand[,]" Rule 26 requires a sufficiently detailed description of the expert's opinions and
     the basis for those opinions "that the opponent will be ready to rebut, to cross-examine, and to
25   offer a competing expert if necessary."  *Williams v. Univ. Medical Center of S. Nev.*, No. 2:09-
26   cv-00554 PMP PAL, 2010 WL 2802214, *4 (D. Nev. July 14, 2010) (citing *Walsh v. Chez*, 583
27   F.3d 990, 994 (7th Cir. 2009)).
         Under Rule 37(c)(1), a party who fails, without substantial justification, to disclose the
28   information required by Rule 26(a) is not, unless the failure is harmless, permitted to use such

1

2

3   evidence at trial.  Rule 37 states:

> "A party that without substantial justification fails to disclose information required
> by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by
> Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence
> at a trial, at a hearing, or on a motion any witness or information not so disclosed."
> FED.R.CIV.PROC. 37( c)(1).

Federal courts apply this rule strictly and exclude undisclosed evidence absent harmless error or substantial justification. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed. . . . Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless"); *Self-Insurance Institute of America, Inc. v. Software and Information Industry Ass'n.*, 208 F.Supp.2d 1058, 1066 (C.D. Cal. 2000) ("Rule 37(c)(1) precludes the use of evidence not disclosed as required under Rule 26(a) or 26(e)(1)").

On April 18, 2014, Intervention served Rule 26 expert disclosures that identified Dr. Harry Harountunian, Jim Cioffi, and Andrew Wainwright as experts.  It also produced a report prepared by each expert.  The City filed a motion to compel, arguing, *inter alia*, that the reports failed adequately to disclose the facts and data on which the experts relied.  On June 30, 2014, Magistrate Judge Oswald Parada granted the City's motion and ordered Intervention to provide supplemental expert reports that complied with Rule 26.  (Minutes (In Chambers): Order by Magistrate Judge Oswald Parada, Docket No. 57 (May 30, 2014) at 8.)  The City contends that Cioffi's supplemental disclosures remain inadequate, and asks the court to exercise its inherent power to impose sanctions and exclude his testimony.  (Objections to Cioffi Decl. at 3-4.)  The City does not seek sanctions under Rule 37.

In his supplemental report, Cioffi identifies the basis for his opinions as follows:

> "I have based the above opinions on my experience working with the Palm Springs
> Land Development Code, the California Fire Code and regulations; prior work on
> assisted living facilities within the City of Palm Springs (i.e. the Michaels House
> CUP); my involvement in the CUP process with respect to the Alexander and the
> Palm Tee; the interviews with Ken Seeley and Eric McLaughlin set forth above;
> Intervention911's house rules, admission forms, and web-site informational
> materials; and fire inspection reports, business licenses, building permits,
> certificates of occupancy, house rules, and admissions packets, for Palm Springs
> Sober Living, the Studios, and Roberta's House.  These documents will be provided
> upon request.  My above opinions are also based on site visits to the Alexander, the
> Palm Tee, Palm Springs Sober Living, the Studios, and Roberta's House."  (Ex
> Parte Application to Enforce Court's May 30, 2014 Order re Plaintiff's Expert
> Designation, Docket No. 66 (June 17, 2014), Exh. C at 3.)

This disclosure satisfies Rule 26(a)(2)(B).  The court does not find it "vague and muddled," as the City contends; to the contrary, Cioffi identifies the documents and other sources on which he relied in forming his opinions.  Although the City argues that Cioffi was required to identify the

facts and data used to support each portion of each opinion in his report (Objections to Cioffi Decl. at 3), the plain language of Rule 26 and the authorities the City cites do not support the proposition. The court therefore declines to exclude Cioffi's testimony on this basis.

The City objects specifically to Cioffi's statement that the third-party sober living facilities are similar to Intervention's on the grounds that the evidence is irrelevant, lacks foundation, constitutes an improper legal opinion, and is hearsay. (Reply SGI at 49-50; Objections to the Declaration of James Cioffi ("Objections to Cioffi Decl."), Docket No. 80 (June 23, 2014) at 8-10.) It also objects that Intervention offers no evidence that the other sober living facilities are sufficiently similar to its own that they would require CUPs. (*Id.* at 50.) The court addresses the last objection first. In his declaration, Cioffi states that the facilities are similar. (Declaration of James Cioffi ("Cioffi Decl."), Docket No. 70 (June 17, 2014), ¶ 9.)

The City asserts that this paragraph of Cioffi's testimony is irrelevant, lacks foundation, and constitutes an improper legal opinion. (Objections to Cioffi Decl. at 7-8.) The testimony is relevant, however, because it is probative of the facilities' similarity, which in turn tends to make more probable of Intervention's claims of discriminatory enforcement. Cioffi states that he has reviewed the house rules for the third-party sober living facilities, read the testimony from City staff, and investigated public records. (Cioffi Decl., ¶ 10.) This provides sufficient foundation for his statement that the facilities are similar. Finally, the court overrules the hearsay objection because Cioffi could present the testimony he gave at deposition by appearing as a witness at trial. *Fraser*, 342 F.3d at 1036.

The court next considers the City's objections to Intervention's proposed fact regarding the third-party facilities. Cioffi asserts that, based on the testimony of the City's staff and his own investigation of public records, he learned that the City did not classify other sober living apartments as assisted living facilities, require them to obtain CUPs, or mandate that they install code upgrades such as fire sprinklers. (Cioffi Decl., ¶¶ 10-11.) The fact that Intervention was treated differently than other sober living facilities tends to make it more probable that the City discriminated against Intervention; the evidence is therefore relevant, even though, as the court discusses *infra*, other sober living facilities are within the same protected class as the Intervention facilities. Cioffi's review of the testimony given by City staff members and his investigation of public records provides adequate foundation for his statement. Cioffi's statement is not a legal opinion.

The City also objects on authentication grounds to the house rules for the sober living facilities, which Cioffi attaches to his declaration. (Objections to Cioffi Decl. at 8-9.) This objection is also overruled because experts may base their opinions on otherwise inadmissible evidence if it is the type of information on which experts in the field typically rely. See, e.g., *Gagnon v. Lemoyne Sleeper Co., Inc.*, Civil Action No. 1:CV–05–208, 2009 WL 1324141, *5-7 (M.D. Pa. May 12, 2009) (admitting expert testimony based on the unauthenticated medical records of plaintiff's treating physicians because the records were the type of information on which experts in the field reasonably rely). See also *Williams v. Illinois*, __ U.S. __, 132 S.Ct. 2221, 2246 (2012) (Breyer, J., concurring) ("Under well-established principles of evidence, experts may rely on otherwise inadmissible out-of-court statements as a basis for forming an expert opinion if they are of a kind that experts in the field normally rely upon"); *Engebretsen v.*

purportedly impose similar rules and regulations on their residents.[103]

_____

*Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994) ("Rule 703 allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion"); *United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) ("According to Rule 703, the facts that form the basis for an expert's opinions or inferences need not be admissible in evidence '[i]f of a type reasonably relied upon by experts in the particular field.' Fed.R.Evid. 703. . . . Thus, expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions"). The court notes, in this regard, that the house rules are not themselves being offered in evidence; rather, they provide support for the expert opinions being expressed.

Cioffi opines that Intervention's facilities are more like hotels than assisted living facilities. When asked at his deposition whether it would be reasonable for another person to conclude that the facilities more closely resembled assisted living facilities, he testified that such an opinion "could be deemed reasonable," but that he did not "agree with that opinion[.]" He also stated that Intervention's use of The Alexander and Palm Tee is compatible with the mixed-use neighborhoods in which they are located, and that maintaining the facilities as hotels and/or multi-family dwellings would not have altered the zoning scheme. (SGI Plaintiff's Fact # 17.) The City objects that Cioffi's testimony is irrelevant, lacks foundation, is argumentative, and constitutes an improper legal opinion. (Reply SGI at 53-54; Objections to Cioffi Decl. at 10.) The court sustains the last objection and declines to consider the testimony. See *United States v. Baca*, 610 F.Supp.2d 1203, 1220 (E.D. Cal. 2009) (" In her opinion, the roundhouse, built in 1974, was considered a cultural resource for § 2.1(a)(5) purposes. . . . This was an improper opinion, as no expert may offer an opinion which is a legal conclusion. . . . Whether the roundhouse was a cultural resource was a mixed question of fact and law," citing *Nationwide Transport Finance v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her legal conclusion")); *Pinal Creek Group v. Newmont Mining Corp.*, 352 F.Supp.2d 1037, 1043 (D. Ariz. 2005) ("In addition to prohibiting legal expert testimony which defines the governing law, courts have also prohibited legal expert opinion which applies the law to the facts. Many courts have held that the judge is the sole arbiter of the law and its application to the facts").

[103]SGI, Plaintiff's Fact # 13. The City objects that this evidence is irrelevant, lacks foundation, constitutes an improper legal opinion, and is hearsay. (Reply SGI at 50-51.) Intervention cites the deposition testimony of Jeff Christensen and James Cioffi as support for this fact. The City objects to the entirety of Cioffi's and Christensen's declarations on the grounds that the declarations were stricken by the clerk because they failed to comply with Local Rules 11-3.8, 11-5.2, and 11-5.3, and were untimely when refiled on June 17, 2014. (Objections to Cioffi Decl,at 2; Objections to the Declaration of Jeff Christensen ("Objections to Christensen Decl."), Docket No. 79 (June 23, 2014) at 2.) For the reasons previously stated, the court overrules these objections. See note 25, *supra*.

As respects the City's other objections, Cioffi reviewed the house rules of the other sober living facilities and visited them, and thus has personal knowledge of their rules. Christensen

When asked why he had not taken similar action against the other sober living apartments, Ewing explained that he had not received any neighbor complaints concerning them, and that the Planning Department generally investigated facilities based on whether it received complaints regarding them.[104]

### E.      Intervention's Claims

Intervention alleges claims for intentional discrimination under the FHA, ADA, and FEHA, and for denial of reasonable accommodations under the FHA and FEHA.[105]  Its intentional

---

similarly reviewed the house rules for other facilities.  The court therefore overrules the foundation objection.  The testimony is relevant because it tends to prove that the City departed from prior zoning practices regarding sober living facilities.  The experts do not offer legal opinions.  Finally, as noted, experts are permitted to rely on inadmissible evidence in forming their opinions.  See *Williams*, 132 S.Ct. at 2246; *Engebretsen*, 21 F.3d at 728; *Locascio*, 6 F.3d 924.  For this reason, the City's hearsay objection is thus overruled, as are its relevance, foundation, and legal opinion objections.

The City also objects on authentication grounds to the house rules for the sober living facilities, which Cioffi and Christensen attach to their declarations.  (Objections to Cioffi Decl. at 8-9; Objections to Christensen Decl. at 3-4).  The court has already overruled objections to the use of this evidence to support expert opinion testimony.  See note 102, *supra*.

[104]SGI, Plaintiff's Fact # 14.  See Loeb Decl., Exh. J at 87:11-88:21 ("Q. And when Mr. McLaughlin wrote to you and said, 'Take a look at Palm Springs Sober Living and The Studios of Palm Springs,' you can't recall getting on the Internet and typing in these addresses or these titles of these other sober living homes to see what they looked like? A. Well, that – he didn't ask us to look at it. He just asked if there were others that didn't get a CUP. Q. Okay. And did you do an investigation? A. I don't recall. Q. Okay. Would there have been any harm in you taking the time to look and see whether or not there were other similarly-situated-type sober living homes to see whether or not they had received CUPs?  A. We do a lot of things, and whether there was any harm or not doesn't necessarily come into play. Q. Okay. A. It's based on whether we get a complaint. Q. Okay. Complaints from neighbors? A. Complaints generally. Q. Okay. From neighbors or elected officials, right?  A. Anybody").  The City objects that this evidence is irrelevant, lacks foundation, constitutes an improper legal opinion, and is hearsay.  (Reply SGI at 51-52.)  The testimony is relevant in assessing the City's reasons for its code enforcement activities against Intervention.  As the planning director, moreover, the reasons why the Planning Department initiates enforcement action is within Ewing's personal knowledge.  The testimony expresses no legal opinion, and is not based on out-of-court statements.  The City's objections are therefore overruled.

[105]Opposition at 15; Complaint, ¶¶ 102-09.

1  discrimination claims focus on code enforcement actions taken by the City and PSFD, specifically,

2  (1) the requirement that Intervention file CUP applications, (2) the planning department's

3  subsequent refusal to recommend approval of the applications, requiring instead that Intervention

4  convert seek PDD permits, and (3) the PSFD's classification of the facilities as R-4 and R-2.1,

5  requiring installation of upgraded fire safety systems. Intervention's reasonable accommodation

6  claims focus on the City's refusal to treat The Alexander and Palm Tee either like other sober

7  living apartments in the Palm Springs, as multi-family dwellings, or as extended stay hotels, and

8  the PSFD's refusal to waive its requirement that the facilities upgrade their fire safety systems.

## II.  DISCUSSION

### A.    Legal Standard Governing Motions for Summary Judgment

11       A motion for summary judgment must be granted when "the pleadings, the discovery and

12  disclosure materials on file, and any affidavits show that there is no genuine issue as to any

13  material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.PROC.

14  56.  A party seeking summary judgment bears the initial burden of informing the court of the

15  basis for its motion and of identifying those portions of the pleadings and discovery responses that

16  demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477

17  U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial,

18  the movant must affirmatively demonstrate that no reasonable trier of fact could find other than

19  for the moving party. On an issue as to which the nonmoving party will have the burden of proof,

20  however, the movant can prevail merely by pointing out that there is an absence of evidence to

21  support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the

22  nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts

23  showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

24  250 (1986); FED.R.CIV.PROC. 56(e)(2).  Evidence presented by the parties at the summary

25  judgment stage must be admissible. FED.R.CIV.PROC. 56(e)(1). In reviewing the record, the court

26  does not make credibility determinations or weigh conflicting evidence.  Rather, it draws all

27  inferences in the light most favorable to the nonmoving party. See *T.W. Electric Service, Inc. v.*

28  *Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

**B.     Whether Intervention's Direct Discrimination Claims are Ripe**

The City argues, as a threshold matter, that two of Intervention's direct discrimination claims fail because they are not ripe.[106]  It contends Intervention cannot assert that it was harmed by the City's failure to issue a CUP because it withdrew its first permit application and never reapplied.[107]   The City also asserts that Intervention's claim based on the Fire Department's determination under the state Building Code is likewise not ripe because Intervention did not appeal the Fire Department's decision to classify the facilities R-4 and R-2.1 (the "change of use" claim).[108]   The City does not assert a ripeness objection to Intervention's claim that the City's classification of its facilities as assisted living facilities and its requirement that Intervention file CUP applications constituted discrimination (the "zoning" claim).   Nor does it challenge Intervention's failure to make reasonable accommodation claims on ripeness grounds.

Under Article III, section 2 of the United States Constitution, federal courts have jurisdiction to adjudicate only actual "Cases" or "Controversies."  U.S. CONST., art. III, § 2, cl. 1; see also *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) ("It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy"); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution"); *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999) ("The twin pillars of standing and 'case or controversy' go to the heart of Article III jurisdiction.  The corollary to these principles is that federal courts have no jurisdiction to hear a case . . . where no actual or live controversy exists").

---

[106]MSJ at 9.

[107]*Id.*

[108]*Id.*

Article III's case or controversy limitation requires those who invoke the power of a federal court to demonstrate standing. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

The party invoking federal jurisdiction bears the burden of establishing each of these elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In *Lujan*, the Supreme Court explained that a plaintiff's burden to establish standing depends on the stage of the litigation at which the issue is raised:

> "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* at 561 (internal citations omitted).

Like the standing doctrine, the doctrine of ripeness requires that the court "consider whether the plaintiffs face a realistic danger of sustaining a direct injury . . . or, by contrast, if the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *City of Auburn v. Qwest Communication*, 260 F.3d 1160, 1171 (9th Cir. 2001); see also *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993) (ripeness "focuses on whether there is sufficient injury, and thus is closely tied to the standing requirement"). "The ripeness doctrine seeks to separate

matters that are premature for review because the injury is speculative and may never occur from those cases that are appropriate for federal court action." *Id.* (quoting E. Chemerinsky, FEDERAL JURISDICTION 99 (1989) (in turn citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967), overruled on other grounds, *Califano v. Sanders*, 430 U.S. 99 (1977)). "The 'basic rationale' of the ripeness requirement is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (citing *Abbott Laboratories*, 387 U.S. at 148).

As the Supreme Court and the Ninth Circuit have observed, the ripeness requirement "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Thomas*, 220 F.3d at 1138; see also *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 734 n. 7 (1997). "If a case is not ripe for review, then there is no case or controversy, and the court lacks subject-matter jurisdiction." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005).

In considering whether a case is ripe for review, a court must assess "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Ass'n of American Medical Colleges v. United States*, 217 F.3d 770, 779-80 (9th Cir. 2000) (quoting *Abbot Laboratories*, 387 U.S. at 149). "Under the first prong, 'agency action is fit for review if the issues presented are purely legal and the regulation at issue is a final agency action.'" *Id.* at 780 (quoting *Anchorage v. United States*, 980 F.2d 1320, 1323 (9th Cir. 1992)). To determine whether agency action is final, courts consider the following elements: "whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Id.* at 780. See *Ukiah Valley Medical Ctr. v. Fed. Trade Comm'n*, 911 F.2d 261, 264 (9th Cir. 1990) ("The general rule is that administrative orders are not final and reviewable 'unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process,'" quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). Thus, "[a] claim is not ripe for adjudication if it rests upon contingent future events that

may not occur as anticipated, or indeed may not occur at all[.]"  *Ass'n of American Medical Colleges*, 217 F.3d at 782 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  See *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) ("As a general matter, two conditions must be satisfied for agency action to be considered 'final': First, the action must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow" (internal citations and quotation marks omitted)).

Applying these principles, the court concludes that Intervention's "change of use" intentional discrimination claim based on the PSFD's reclassification of its facilities as R-4 and R-2.1 is ripe for decision.  First, the PSFD's reclassification was not a tentative or interlocutory action, but rather a final decision, and thus, a final action.  Second, the action determined Intervention's rights and obligations by requiring that it provide automatic fire sprinkler systems and fire alarm and detection systems in the plan submittal and approval process before the City.[109] The decision had the status of law because it rendered the facilities' existing fire safety systems non-compliant, requiring the installation of new systems and subjecting Intervention to further enforcement action if it failed to comply.  See 2010 CAL. FIRE CODE, Title 24, Part 9 § 109.1 ("It shall be unlawful for a person, firm or corporation to erect, construct, alter, repair, remove, demolish or utilize a building, occupancy, premises or system regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code"); *id.*, § 109.2 ("When the fire code official finds a building, premises, vehicle, storage facility or outdoor area that is in violation of this code, the fire code official is authorized to prepare a written notice of violation describing the conditions deemed unsafe and, when compliance is not immediate, specifying a time for reinspection"); *id.*, § 109.2.3 ("If the notice of violation is not complied with promptly, the fire code official is authorized to request the legal counsel of the jurisdiction to institute the appropriate legal proceedings at law or in equity to restrain, correct or abate such violation or to require removal or termination of the unlawful occupancy of the

---

[109]See Kaufman Decl., Exh. P at 4.

structure in violation of the provisions of this code or of the order or direction made pursuant hereto");[110] Palm Springs Ordinance No. 1781 § 1 (adopting the California Fire Code, 2010 Edition).[111]

The court finds unavailing the City's argument that the claim is not ripe because Intervention could have, but did not, appeal the decision to the State Fire Marshal.   Other courts have rejected arguments that plaintiffs alleging FHA violations must exhaust other remedies before their claims are ripe for purposes of Article III.  See *Sharpvisions, Inc. v. Borough of Plum*, 475 F.Supp.2d 514, 521-22 (W.D. Pa. 2007) (holding that plaintiff had stated a ripe FHA claim despite having not appealed a zoning decision in state court, and stating: "Defendants base their motion for summary judgment, in large part, on the argument that because plaintiff filed no appeal from the decision of the Zoning and Hearing Board, this action is not ripe for judicial review. . . . The crux of plaintiff's case appears to hinge on a challenge to the imposition of conditional use approval as discriminatory under the FHA, in and of itself.  If this Court were to require some additional form of state exhaustion (i.e. the seeking of conditional use approval or the seeking of a variance), plaintiff would be without a remedy for testing the necessity or validity of submitting to the additional steps of obtaining conditional use approval for those with disabilities"); *ReMed Recovery Care Centers v. Township of Worcester*, No. CIV. A. 98–1799, 1998 WL 437272, *6 (E.D. Pa. July 30, 1998) (finding injury in fact from a zoning board's issuance of a cease and desist letter, because "[i]f the court finds a discriminatory housing practice has occurred or is about to occur, the court may award actual or punitive damages, injunctive relief, or other relief.   No present injury is necessary; the threat of a future one is sufficient for adjudication.  The controversy would be ripe even if plaintiff had not applied to the Zoning Board for a variance or special exception"); *Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Township*, 996 F.Supp.409, 426-27 (D.N.J. 1998) ("The proposition that 'litigants are not required to make

[110]http://publiccodes.cyberregs.com/st/ca/st/b300v10/st_ca_st_b300v10_1_sec015.htm (last visited July 1, 2014).

[111]http://www.palmspringsca.gov/index.aspx?page=622, click on "2010 Fire Codes" (last visited July 1, 2014).

futile gestures to establish ripeness,' has been applied in numerous zoning and non-zoning cases to establish the necessary certainty and finality that the 'fitness' prong of the *Abbott* test requires," quoting *Sammon v. New Jersey Bd. of Med. Examiners*, 66 F.3d 639 (3d Cir. 1995) and collecting cases). See also *Murphy v. Zoning Com'n of Town of New Milford*, 223 F.Supp.2d 377, 386 (D. Conn. 2002) ("[P]laintiffs in our case were not required to appeal either the Commission's decision or the [zoning enforcement officer]'s cease and desist order to the [Zoning Board of Appeals] for the issue to be considered ripe for federal court review").

The court reaches a different conclusion, however, with respect to Intervention's claim that it was not issued a CUP. Intervention withdrew its CUP application after it received an email from the Palm Spring Planning Department stating that staff could not forward the project to the Planning Commission with a recommendation for approval.[112] The Planning Department proposed that Intervention convert its application to one for a Planned Development District permit instead.[113] Intervention then withdrew the application. Consequently, the Planning Commission never voted on Intervention's CUP application. Unlike the PSFD's reclassification determination, the email from the Planning Department is not final agency action. Nor does it determine Intervention's rights and obligations. Because Intervention's claim is based only on a contingent future event – i.e., the possibility that the Planning Commission would have denied its application based on the Planning Department's negative recommendation, or that a revised application for a PDD permit would have been unsuccessful – the claim is not ripe for review. See *Ass'n of American Medical Colleges*, 217 F.3d at 782 ("[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all").

**C.   Legal Standard Governing Intervention's Direct Discrimination Claims**

Intervention alleges claims for direct discrimination under the Fair Housing Act, the Americans with Disabilities Act, and California's Fair Employment and Housing Act. The Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f)(1), makes it unlawful "[t]o discriminate in the sale

---

[112]Seeley Decl., Exh. C.

[113]*Id.*

or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap[.]"[114]  Persons recovering from addiction to drugs or alcohol are considered disabled under the FHA and entitled to its protections.  *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013) ("It is well established that persons recovering from drug and/or alcohol addiction are disabled under the FHA and therefore protected from housing discrimination"); *City of Edmonds v. Washington State Bld. Code Council*, 18 F.3d 802, 804 (9th Cir. 1994) ("Participation in a supervised drug rehabilitation program, coupled with non-use, meets the definition of handicapped"); 42 U.S.C. § 3602(h).  Zoning practices that discriminate against disabled individuals can de discriminatory if they contribute to "mak[ing] unavailable or deny[ing]" housing to those persons.  *Pacific Shores Properties*, 730 F.3d at 1157 (alterations original).  Sober living facilities such as The Alexander and Palm Tee are "dwellings" for purposes of the FHA.  See 42 U.S.C. § 3602(b).  Thus, discrimination affecting the availability of such housing violates the FHA.  See *Pacific Shores Properties*, 730 F.3d at 1157.[115]

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  Like the FHA, the ADA prohibits governmental entities from discriminating against disabled persons in zoning decisions.  *Pacific Shores Properties*, 730 F.3d at 1157 (citing *Bay Area Addiction Research & Treatment, Inc. v.*

---

[114]Although the FHA refers to "handicap," the court "use[s] the preferred term, 'disabled,' except when referring to the statutory language."  *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114 n. 5 (9th Cir. 2008).

[115]Although Intervention is not itself a disabled individual, it nonetheless has standing to sue because it is an "aggrieved person" under the Act.  See *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998) ("The Act provides for a private claim to those who are 'aggrieved' by discriminatory conduct," citing 42 U.S.C. § 3613); *Wasserman v. Three Seasons Ass'n No. 1, Inc.*, 998 F.Supp. 1445, 1447 (S.D. Fla. 1998) ("The Supreme Court has addressed extensively the issue of standing under the FHA and has ruled that because the FHA gives standing to 'aggrieved persons,' it does not require membership in the protected class for standing," citing *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 103 (1979)).

*City of Antioch*, 179 F.3d 725, 730-32 (9th Cir. 1999)).  Like the FHA, the ADA protects persons recovering from drug or alcohol addiction.  *Pacific Shores Properties*, 730 F.3d at 1157 (citing *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004)).  Courts analyzing disparate treatment claims apply the same standards to FHA and ADA claims.  *Id.* (citing *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 n. 4 (2d Cir. 2003)).[116]

Under the Fair Employment and Housing Act ("FEHA"), California Government Code § 12955, it is unlawful "[t]o discriminate through public or private land use practices, decisions, and authorizations because of . . . disability. . . ."  CAL. GOV'T CODE § 12955(l).  "Discrimination includes, but is not limited to, restrictive covenants, zoning laws, denials of use permits, and other actions authorized under the Planning and Zoning Law (Title 7 (commencing with Section 65000)), that make housing opportunities unavailable."  *Id.*  Courts have construed FEHA as proscribing discrimination on the basis of prior alcohol and drug use.  *Lopez v. Pacific Maritime Ass'n*, 657 F.3d 762, 765 (9th Cir. 2011) ("The ADA and the FEHA protect people who are recovering or who have recovered from a drug addiction"); *Gosvener v. Coastal Corp.*, 51 Cal.App.4th 805, 813 (1996) ("[A]lcoholism could be a covered disability under the FEHA, which incorporates the definition of disability listed in the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111)"), disapproved on other grounds in *Colmenares v. Braemar Country Club, Inc.*, 29 Cal.4th 1019 (2003).  Courts "apply the same standards to FHA and FEHA claims." *Walker v. City of Lakewood*, 272 F.3d 1114, 1131 n. 8 (9th Cir. 2001).  The standards of proof required for Intervention's FHA, ADA, and FEHA disparate treatment claims are thus identical,

---

[116]Like the FHA, the ADA affords Intervention a cause of action even though it is not a disabled individual.  See *Pacific Shores*, 730 F.3d at 1157 n. 17 (noting that the ADA provides group homes for recovering alcoholics and drug users a cause of action even though they are not disabled persons); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002) ("Because Plaintiff has presented evidence that it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities, Plaintiff has standing to bring this suit on its own behalf"); 42 U.S.C. § 12133 (extending a cause of action to "any person alleging discrimination on the basis of disability").

and are drawn largely from Title VII cases.  See *Pacific Shores Properties*, 730 F.3d at 1158 n. 19.[117]

To prove that the City engaged in intentional discrimination, Intervention relies exclusively on the "sensitive" multi-factor inquiry articulated by the Supreme Court in *Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 242 (1977).[118]  Under *Arlington Heights*, a plaintiff must

---

[117]As with its federal claims, Intervention has standing to bring a claim as an "aggrieved person" under Government Code § 12989.1.  FEHA authorizes "[a]n aggrieved person" to file suit seeking relief for a discriminatory housing practice or a breach of a conciliation agreement. CAL. GOV'T CODE § 12989.1.  The act defines "aggrieved person" as "includ[ing] any person who claims to have been injured by a discriminatory housing practice or believes that the person will be injured by a discriminatory housing practice that is about to occur."  CAL. GOV'T CODE § 12927(g).  It incorporates the FHA's definition of "person," 42 U.S.C. § 3602(d), which states that "'[p]erson' includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries."  Courts have thus held that FEHA provides a cause of action to entities, such as Intervention, which are not themselves disabled.  See *Sisemore v. Master Fin., Inc.*, 151 Cal.App.4th 1386, 1426 (2007) ("Since Project Sentinel has alleged that it has been required to divert scarce resources to address Master Financial's alleged wrongful conduct, we conclude that Project Sentinel is a 'person aggrieved' under section 12989.1 and has standing to assert a [discrimination] FEHA claim").  Cf. *Walker v. City of Lakewood*, 272 F.3d 1114, 1126 (9th Cir. 2001) (holding that an independent fair housing services provider had standing to bring a retaliation claim under FEHA).

[118]Opposition at 16-19.  Although the City also addresses the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), (see MSJ at 9, 13-14), Intervention does not argue that its claims satisfy this test.  To make out a prima facie case based on denial of a conditional use permit under *McDonnell Douglas*, a plaintiff must establish that "(1) plaintiff is a member of a protected class; (2) plaintiff applied for a conditional use permit and was qualified to receive it; (3) the conditional use permit was denied despite plaintiff being qualified; and (4) defendant approved a conditional use permit for a similarly situated party during a period relatively near the time plaintiff was denied its conditional use permit."  *Gamble v. City of Escondido*, 104 F.3d 300 (9th Cir. 1997) (applying the *McDonnell Douglas* test to an application for a conditional use permit).  "[I]f the plaintiff establishes the prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action."  *Id.*  "[I]f the defendant satisfies its burden, the plaintiff must prove by a preponderance of evidence that the reason asserted by the defendant is a mere pretext."  *Id.*  "In lieu of satisfying the elements of a prima facie case, a plaintiff may also 'simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated' the challenged decision."  *Budnick v. Town of Carefree*, 518 F.3d 1109, 1114, (9th Cir. 2008) (quoting *McGinest*

"'simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely that not motivated' the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Pacific Shores Properties*, 730 F.3d at 1158 (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)). The court then analyzes whether a discriminatory purpose motivated the defendant by examining (1) statistics demonstrating a "clear pattern unexplainable on grounds other than" discriminatory ones, (2) "[t]he historical background of the decision," (3) "[t]he specific sequence of events leading up to the challenged decision," (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant "legislative or administrative history." *Id.* at 1158-59 (quoting *Arlington Heights*, 429 U.S. at 266-68). See also *id.* at 1162-64 (applying *Arlington Heights* to intentional discrimination claims under the FHA, ADA, and FEHA); *Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) (applying *Arlington Heights* in analyzing FHA, FEHA, equal protection, and Title VI claims). These factors are non-exhaustive. *Arlington Heights*, 429 U.S. at 268.

A plaintiff relying on *Arlington Heights* to demonstrated discriminatory intent through direct or circumstantial evidence need provide "'very little such evidence . . . to raise a genuine issue of fact . . . ; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder.'" *Pacific Shores Properties*, 730 F.3d at 1159 (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996)).

### D.     Whether the Court Should Grant Summary Judgment on Intervention's Direct Discrimination Claims

As neither party argues that the first and fifth factors are relevant in assessing Intervention's claims, the court focuses on the second, third, and fourth of the *Arlington Heights* factors.

*v. GTE Serv. Corp.*, 360 F.3d 1103, 1122-23 (9th Cir. 2004)).

### 1.   Historical Background of the Decision

The court begins by examining the historical background of the City's decisions that form the basis for the zoning and change of use claims; these center, as noted earlier, on the classification of the facilities as assisted living facilities under the city zoning code – thus requiring the submission of CUP applications – and the reclassification of the facilities as R-4 and R-2.1 under the State Building and Fire Codes – thus requiring upgraded fire safety systems. Changes in zoning classifications that preclude unwanted developments can demonstrate discriminatory intent. See *Arlington Heights*, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes. For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case" (internal citations omitted)). Because it has the same effect, an unreasonable classification of a facility for zoning purposes that requires that it obtain a special zoning exemption or undertake costly upgrades can likewise demonstrate discriminatory intent. See *Stewart B. McKinney Found., Inc. v. Town Plan and Zoning Com'n of Fairfield*, 790 F.Supp.1197, 1212-16 (D. Conn. 1992) (a nonprofit housing corporation demonstrated a likelihood of success on the merits of its FHA intentional discrimination claim where the Town Plan and Zoning Commission unreasonably classified it as a charitable institution or chronic and convalescent nursing home, thus requiring that it obtain a special exception for its intended use of a two-family residence to provide housing for HIV-infected persons). Of course, classification of a new facility does not alone demonstrate discriminatory intent, and the parties vigorously dispute whether the City's and PSFD's classifications were required by the facilities' conversion to sober living use. Both the Palm Springs Zoning Code and the State Building Code provide that where a facility does not fit an existing definition, it may be classified as being in the most similar category.[119] Intervention has

---

[119]Kaufman Decl., Exhs. L, P.

1   adduced evidence that although its facilities did not provide onsite services, both the City and the

2   PSFD cited the provision of services as justification for their classification decisions.[120]

3        Intervention has also adduced evidence that other sober living facilities were not classified

4   as assisted living facilities and were not required to install fire sprinklers.  Taken together, and

5   drawing all inferences in favor of Intervention, the historical background of the decision suggests

6   that triable issues of fact exist as to whether the City's classification of The Alexander and Palm

7   Tee as assisted living facilities, and the PSFD's reclassification of the facilities as R-4 and R-2.1

8   under the State Building Code, were discriminatory.

9                **2.   Sequence of Events Leading up to the Challenged Decisions**

10        The court next considers the specific sequence of events leading to the challenged

11   decisions.  Intervention asserts Ewing's testimony demonstrates that the City's code enforcement

12   activities resulted from community opposition to Intervention's facilities.[121]  The City counters that

13   community members' NIMBY complaints do not raise triable issues of fact because there is no

14   evidence the City relied on those complaints in making its decision.[122]

15        Intervention has adduced evidence that certain community members did not wish to have

16   the facilities in their neighborhoods, and made a concerted effort to persuade city officials to act

17   on their concerns.  It cites cases finding that the presence of community animus can support a

18   finding of discriminatory motives by government officials, even if the officials do not personally

19   hold such views.[123]  See *Tsombanidis v. City of West Haven, Conn.*, 129 F.Supp.2d 136, 152 (D.

20   Conn. 2001) ("[E]ven where individual members of government are found not to be biased

21   themselves, liability may still be imposed where discriminatory governmental actions are in

22   response to significant community bias"); see also *Innovative Health Sys., Inc. v. City of White

23   Plains*, 117 F.3d 37, 49 (2d. Cir. 1997) ("The City additionally contends that the appellees have

24   ────────────────

25      [120]*Id.*

26      [121]Opposition at 18.

27      [122]Reply at 3.

28      [123]Opposition at 17.

not produced any evidence of the City's discriminatory motives in denying the building permit to IHS.  There is little evidence in the record to support the ZBA's decision on any ground other than the need to alleviate the intense political pressure from the surrounding community brought on by the prospect of drug- and alcohol-addicted neighbors.  The public hearings and submitted letters were replete with discriminatory comments about drug- and alcohol-dependent persons based on stereotypes and general, unsupported fears.  Although the City certainly may consider legitimate safety concerns in its zoning decisions, it may not base its decisions on the perceived harm from such stereotypes and generalized fears.  As the district court found, a decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter"), superseded on other grounds as recognized in *Zervos v. Verizon New York, Inc.*, 252 F.3d 163 (2d Cir. 2001) .

As support for its argument that community members' views cannot be imputed to the City absent evidence that it relied on them in making its decision, the City cites *Budnick v. Town of Carefree*, 518 F.3d 1109 (9th Cir. 2008), and *MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 736-37 (9th Cir. 2005), cases in which courts declined to impute the viewpoints of outspoken community members to government decision-makers.[124]   In *MetroPCS*, community members asserted at a public hearing that a proposed wireless antenna installation "was not necessary for MetroPCS or the community since the Richmond District already enjoys excellent wireless service, that the facility would create a visual blight detrimental to the neighborhood character and that the facility would produce harmful RF emissions hazardous to public health."  *Id*. at 720.  After the Board of Supervisors voted to deny a CUP for the project, MetroPCS sued.  It alleged violations of the Telecommunications Act of 1996, which prohibits localities from basing zoning decisions on concerns over radio frequency emissions from proposed projects, like MetroPCS's, that comply with FCC requirements.  *Id*. at 736.  The Ninth Circuit held that the board had not violated the TCA, even though it stated that it had "reviewed and

---

[124]Reply at 3-6.

1  considered" all public comments because this "is exactly what a local zoning board is supposed

2  to do at a public hearing."  *Id.* at 736-37.

3        In *Budnick*, plaintiff filed an application for site plan approval and a special use permit

4  (SUP) to build a continuing-care retirement community in the Town of Carefree.  518 F.3d at

5  1112.  After the Town Council voted to deny the SUP, Budnick raised for the first time the fact

6  that the planned facility would serve "disabled residents"; this contradicted prior statements that

7  residents would be limited to "healthy, active, independent seniors."  *Id.* at 1112-13.  Carefree

8  then offered Budnick several options that would have permitted construction of the facility.  These

9  included helping Budnick locate the project on an appropriately zoned piece of land, and offering

10 to reconsider the application if certain changes were made.  *Id.*  Budnick sued, alleging claims

11 under the ADA and Fair Housing Amendments Act ("FHAA").  The court granted summary

12 judgment in favor of Carefree, *id.* at 1111, and the Ninth Circuit affirmed.  It held that comments

13 by neighbors opposing the facility at zoning hearings did not demonstrate that Carefree acted with

14 a discriminatory motive.  *Id.* at 1117-18.  Citing *MetroPCS*, the court stated that "[t]here [was]

15 no evidence in the record to suggest that the cited comments or similar ones, which were a small

16 part of the total comments, motivated the commissioners or Town Council members to vote

17 against the SUP, and we decline to make such an inference based solely on the fact that the

18 comments were made."  *Id.*

19       The court finds these cases distinguishable.  Unlike in *MetroPCS*, Intervention does not

20 rely exclusively on a statement that the City "reviewed and considered" all public comments to

21 impute community members' opinions to it.  Rather, it has adduced substantial evidence raising

22 questions concerning the propriety of the City's and PTSD's classification of the facilities; this

23 includes evidence that both bodies relied on the provision of services Intervention did not actually

24 provide in making their classification decisions, and evidence that Intervention's facilities were

25 treated differently than other sober living apartments following community members' complaints,

26 and the fact that the City's elected officials expressed an unusual degree of interest in the status

27 of the facilities.  *Budnick* is likewise distinguishable.  Budnick told Carefree prior to the vote that

28 the facility would *not* include disabled residents.  This alone undercuts any finding of

discriminatory intent by the Town Council, as it is unclear how Carefree could have discriminated against residents it did not know would be housed at the facility.  Moreover, the Town then attempted to work with Budnick to find alternatives that would permit the facility to be built. Here, by contrast, the fact that The Alexander and Palm Tee are sober living facilities was known prior to the classification decisions.  Moreover, Ewing acknowledged that the City actively responded to community members' opposition, and that the Planning Department generally does not investigate facilities absent neighbor complaints.[125]  See *Innovative Health Sys.*, 117 F.3d at 49; *Tsombanidis*, 129 F.Supp.2d at 152.  See also *Stewart B. McKinney Found.*, 790 F.Supp. at 1212 (rejecting an argument that "there is not a shred of evidence that the 'handful' of people opposed to the Foundation's proposal in any way influenced the Commission's decision to require a special exception and, absent such a showing, the plaintiff can not prove discriminatory intent," and concluding that "discriminatory intent can be proven through circumstantial evidence.  [The court] concludes the Commission, at the least, bowed to the political pressure exerted by the residents of Fairfield opposed to the Foundation's plans").  Here, in contrast to *MetroPCS* and *Budnick*, community members' opposition to Intervention's facilities provides circumstantial evidence of discriminatory intent by the City.

### 3.    Departure From Past Practices

Intervention argues that the City departed from its past practice of permitting comparable sober living facilities to operate without a CUP and without having to install upgraded fire safety systems.[126]  The City counters that evidence of past practices does not raise triable issues of fact because it is only relevant to compare zoning decisions concerning Intervention's facilities to decisions concerning facilities outside of the same protected class.  It cites *Tsombanidis*, 352 F.3d at 575, and *Darensburg v. Metro. Transp. Com'n*, 636 F.3d 511, 519-20 (9th Cir. 2011), for the proposition that "[t]he basis for a successful disparate impact claim involves a comparison between

---

[125]Loeb Decl., Exh. J at 87:2-89:13.

[126]Opposition at 18.

41

two groups – those affected and those unaffected by the facially neutral policy."[127] Intervention does not rely on a disparate impact theory, however; its claims are for intentional discrimination, which courts denominate disparate treatment. See *id.* at 573. Moreover, "[p]roving the existence of a similarly situated entity is only *one* way to survive summary judgment on a disparate treatment claim." *Pacific Shores Properties*, 730 F.3d at 1158 (emphasis original). Rather, the plaintiff can adduce direct or circumstantial evidence that the defendant was motivated by discriminatory animus. *Id.*

Intervention has adduced evidence that the City did not require comparable sober living facilities to file applications for CUPs or upgrade their fire safety systems, and that it was subjected to different practices than these facilities. While this evidence would be more probative of discriminatory intent if the comparison group did not consist of other sober living facilities, it nonetheless distinguishes Intervention's facilities, and raises questions regarding the City's motivation, particularly when viewed in the larger context of neighborhood opposition to the facilities and the City's response to the complaints. Intervention has also adduced evidence that City elected officials involved themselves in the Planning Department's decision-making concerning Intervention's facilities to an unusually high degree; Ewing testified that such involvement departed from the dozens of prior CUPs he had processed while working for the City. These facts, which are uncontroverted, are probative of discriminatory intent. See *Tsombanidis*, 129 F.Supp.2d at 152-53 ("Plaintiffs cite to the events leading up to the City's enforcement actions and City officials' departures from normal procedures as evidence of intentional discrimination. Plaintiffs have provided evidence that complaints by neighbors about recovering addicts and alcoholics living in their neighborhood prompted the City's initial action against Oxford House–Jones Hill. The record also reflects that the City faced intense pressure from angry residents to take action against Oxford House–Jones Hill. Neighbors organized a petition-signing drive, spoke out at a City Council meeting, and met with the Mayor and other City officials on several occasions, pleading with the City to order an immediate cease and desist

---

[127]Reply at 1-2.

42

to this 'rehab house' and expressing anger at the City's lack of action.  Several of the group met with the Mayor and building and zoning officials to determine the status of the City's enforcement efforts and what was being done. The Mayor described the neighbors as very angry and consulted with the Mayor of New Haven to determine whether New Haven had received the same community opposition to Oxford House group homes and to find out how he had handles the problem. . . .  Plaintiffs also cite to the City's unprecedented involvement of the Fire District in zoning and building issues.  They argue that this departure from ordinary procedures was the result of the City's enhanced enforcement efforts directed at Oxford House–Jones Hill because of the nature of its residents. . . .  At this summary judgment stage, the Court finds that the plaintiffs have provided sufficient evidence of the events leading up to the City's enforcement activities and departures from the normal procedures and substantive criteria to raise genuine issues of material fact as to whether actions taken by City officials were motivated in part a discriminatory purpose").

### 4. Conclusion Regarding Intervention's Discrimination Claims

Viewing the *Arlington Heights* factors in combination, and drawing all inferences in favor of Intervention, the court finds that triable issues of fact remain as to whether the classification decisions concerning Intervention's facilities were the product of discrimination on the basis of disability.  The court therefore denies the City's motion for summary judgment on Intervention's direct discrimination claims based on the City's requirement that it file applications for CUPs and the PSFD's reclassification of the facilities as R-4 and R-2.1 under the State Building and Fire Codes.

### E. Legal Standard Governing Reasonable Accommodation Claims

The City next moves for summary judgment on Intervention's reasonable accommodation claims.  To prove that defendant failed reasonably to accommodate a disability in violation of the FHA, "a plaintiff must demonstrate that (1) he suffers from a handicap as defined by the FHAA; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." *Budnick*, 518

F.3d at 1119.  "Ordinarily, an accommodation is reasonable under the FHAA when it imposes no fundamental alteration in the nature of the program or undue financial or administrative burdens." *Giebeler v. M&B Associates*, 343 F.3d 1143, 1157 (9th Cir. 2003) (internal quotation marks omitted).  Whether an accommodation is reasonable is a fact-intensive inquiry rarely suitable for resolution on summary judgment.  *United States v. Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994) ("The reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination"); *Janush v. Charities Housing Dev. Corp.*, 169 F.Supp.2d 1133, 1136 (N.D. Cal. 2000) ("Whether a particular accommodation is reasonable under the circumstances is the type of fact-intensive, case-specific determination that will infrequently be appropriate for resolution on summary judgment").

These same elements, with minor variations, are required to demonstrate disability discrimination under the FEHA:

> "In order to establish discrimination based on a refusal to provide reasonable accommodations, a party must establish that he or she (1) suffers from a disability as defined in FEHA, (2) the discriminating party knew of, or should have known of, the disability, (3) accommodation is necessary to afford an equal opportunity to use and enjoy the dwelling, and (4) the discriminating party refused to make this accommodation." *Auburn Woods I Homeowners Ass'n v. Fair Emp. and Housing Comm.*, 121 Cal.App.4th 1578, 1592 (2004)).

**F.     Whether the Court Should Grant Summary Judgment on Intervention's Reasonable Accommodation Claims**

The City argues that summary judgment should be granted on Intervention's reasonable accommodation claims because Intervention has failed to articulate why its requested accommodations – that it be treated the same as other sober living facilities, i.e., as multi-family dwelling or extended stay hotels allowed as of right in the applicable zoning area, and that PSFD waive the requirement that it upgrade its fire safety systems – were necessary apart from its desire to avoid expenditures required to prosecute CUP applications and install new fire safety

systems.[128]  The City further contends the requested accommodations are not reasonable because they require changes to facially neutral statutes.[129]  Intervention counters that the accommodations are reasonable because the City has allowed other sober living facilities to operate without obtaining CUPs or upgrading their fire suppression systems.[130]  It asserts the accommodations are necessary to ensure that residents of The Alexander and Palm Tee have an equal opportunity to reside together in a facility of their choice, and in this way to help them break the cycle of addiction and reduce the risk that they will relapse.[131]

The City contends that if this were the standard for defining a reasonable accommodation, any accommodation that would benefit a sober living facility would have to be deemed reasonable and necessary, thus placing recovering addicts in a privileged class entitled to preferential treatment.[132]  It asserts additionally that the accommodation is not reasonable because it lacks any nexus with the disability.[133]

In *U.S. Airways v. Barnett*, 535 U.S. 391 (2002), the Supreme Court noted that "preferences will sometimes prove necessary to achieve . . . equal opportunity goal[s]," and that "the fact that the difference in treatment violates a[ defendant's] disability-neutral rule cannot by itself place the accommodation beyond the [law's] potential reach."  *Id.* at 397.  It held, "inferentially, if not expressly," that reasonable "accommodations [can] adjust for the practical impact of a disability, not only for the immediate manifestations of the physical or mental impairment giving rise to the disability."  *Giebeler*, 343 F.3d at 1150 (citing *Barnett*, 535 U.S. at 398).

---

[128]MSJ at 20.

[129]*Id.* at 21.

[130]Opposition at 22.

[131]*Id.* at 24.

[132]Reply at 10.

[133]*Id.*

1    Applying these rules, the *Giebeler* court considered whether the relaxation of a landlord's

2    no-cosigner policy so that plaintiff could to live in an apartment rented for him by his mother

3    constituted a reasonable accommodation.  *Id*. at 1148.  Plaintiff suffered from AIDS, which left

4    him unable to work.  *Id*. at 1147.  His application to rent the apartment was denied because he did

5    not meet the minimum income requirement, and the apartment manager refused to allow his

6    mother to cosign his application due to a policy that prohibited cosigners on lease agreements.

7    *Id*. at 1145.  The court concluded that there was "[a] direct causal link . . . between Giebeler's

8    impairment, his inability to work, and his inability to comply with defendants' minimum income

9    requirement relying solely on his individual income."  *Id*. at 1147-48.  The defendant argued that

10   the request that plaintiff's mother be allowed to cosign was not an accommodation within the

11   meaning of the FHAA because, *inter alia*, it would prefer disabled over non-disabled impecunious

12   individuals, and accommodated plaintiff's poverty rather than his disability.  *Id*. at 1148.  Citing

13   *Barnett*, the court rejected this argument, concluding that Giebeler had requested an

14   accommodation as that term is used in the FHAA.  *Id*. at 1150-51 ("*Barnett* therefore recognized

15   that the obligation to 'accommodate' a disability can include the obligation to alter policies that

16   can be barriers to nondisabled persons as well").  It noted that Giebeler's inability to pay rent was

17   directly linked to his disability, but observed that, under *Barnett*, even if there was no causal link

18   between plaintiff's disability and his lack of financial resources, a relaxation of the cosigner policy

19   could still qualify as an accommodation under the FHAA as long as it "would aid him in obtaining

20   an apartment he could otherwise not inhabit because of his disability."  *Id*. at 1151.

21   The court concluded that Giebeler was entitled to the requested accommodation if it was

22   "necessary to afford [him] equal opportunity to use and enjoy a dwelling," and was "reasonable"

23   within the meaning of that statute.  *Id*. at 1150-51, 1155.  "To prove that an accommodation is

24   necessary, '[p]laintiffs must show that, but for the accommodation, they likely will be denied an

25   equal opportunity to enjoy the housing of their choice.'"  *Giebeler*, 343 F.3d at 1155 (quoting

26   *Smith & Lee*, 102 F.3d at 795).  See *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107

27   F.3d 1374, 1380 (9th Cir. 1997) ("Without a causal link between defendants' policy and

28

46

1  plaintiff's injury, there can be no obligation on the part of defendants to make a reasonable

2  accommodation").

3   Here, as in *Giebeler*, Intervention seeks accommodations to facially neutral policies. The

4  policies' impact on Intervention is financial, as they require that it submit a costly CUP application

5  and make fire safety upgrades. Although avoiding these increased costs does not address the

6  immediate manifestations of its residents' disability, this does not end the analysis under *Barnett*

7  and *Giebeler*. Nor does the fact that the accommodations Intervention seeks will place its disabled

8  residents in a privileged position relative to non-disabled persons. Even though its requests

9  constitute accommodations under the FHAA, however, Intervention has failed to demonstrate that

10  they are necessary. It has adduced no evidence that it will be unable to afford the CUP application

11  process and fire system upgrades, and thus that the facilities will be forced to close their doors if

12  it is not relieved of the obligation to comply with these requirements. Nor has it adduced evidence

13  that it would be unable to recover such expenditures through funds collected from its residents.

14  To the extent Intervention would be required to increase residents' monthly contributions – a

15  possibility it does not discuss in its papers – it adduces no evidence that any increases would

16  render the facilities unaffordable for current clients. Because Intervention has failed to raise

17  triable issues concerning the fact that its requested accommodations are necessary, the court grants

18  summary judgment on its reasonable accommodation claims in favor of the City. Compare

19  *Turning Point, Inc. v. Caldwell*, 74 F.3d 941, 944, 945 (9th Cir. 1996) (holding that the City had

20  unlawfully refused to accommodate disabled residents of a nonprofit homeless shelter by refusing

21  to waive its annual review of a special use permit that allowed the shelter to house more than the

22  maximum number of persons dictated by zoning ordinances, because the maximum occupancy

23  limit was "a severe financial burden [on the shelter] that would eventually force it to close"); *City

24  of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 803-06 (9th Cir. 1994)

25  (holding that a residence for recovering alcoholics and drug addicts that had to have six or more

26  residents to ensure financial self-sufficiency, comply with federal requirements for start-up loans,

27  and provide a supportive atmosphere for the residents, might be entitled to a variance from a

28  single-family zoning ordinance that restricted the number of unrelated persons who could reside

1   in a single home in a residential neighborhood); see also *Smith & Lee Assocs. v. City of Taylor*,

2   102 F.3d 781, 795-96 (6th Cir. 1996) (holding that, where group homes were necessary to prevent

3   the exclusion of disabled persons from residential neighborhoods but were not economically

4   feasible without nine residents, City had to make a reasonable accommodation by altering the

5   six-person occupancy limit specified by law for residentially-zoned areas).

6

7                                **III.  CONCLUSION**

8         For the reasons stated, the court grants summary judgment in favor of the City on

9   Intervention's reasonable accommodation claims.    The court denies summary judgment on

10  Intervention's direct discrimination claims based on the fact that the City required it to submit

11  CUP applications for the facilities, and on the fact that the PSFD reclassified the facilities R-4 and

12  R-2.1 under the State Building and Fire Codes.    The court grants summary judgment on

13  Intervention's direct discrimination claim based on the City's failure to issue CUPs for the

14  facilities.

15

16  DATED: July 7, 2014

17                                   _____
                                     MARGARET M. MORROW
                                     UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28