ROBERT L. KAUFMAN – State Bar No. 66389
rkaufman@wss-law.com
DOUGLAS J. LIEF - State Bar No. 240025
dlief@wss-law.com
WOODRUFF, SPRADLIN & SMART, APC
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Telephone: (714) 558-7000
Facsimile: (714) 835-7787

Attorneys for Defendant CITY OF PALM SPRINGS, a public entity

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERVENTION911, a California corporation,<br><br>Plaintiff(s),<br><br>v.<br><br>CITY OF PALM SPRINGS, a California Charter city,<br><br>Defendant(s). | CASE NO.: EDCV13-01117 MMM (OPx)<br><br>BEFORE THE HONORABLE MARGARET M. MORROW COURTROOM 780<br><br>**CITY OF PALM SPRINGS' TRIAL BRIEF**<br><br>HEARING DATES PENDING:<br>Type:      Trial<br>Date:      September 2, 2014<br>Time:      8:30 a.m.<br>Courtroom: 780 |

Defendant CITY OF PALM SPRINGS, a public agency, hereby submits its Trial Brief.

DATED: August 19, 2014        WOODRUFF, SPRADLIN & SMART, APC

By: /s Robert L. Kaufman
    ROBERT L. KAUFMAN
    DOUGLAS J. LIEF
    Attorneys for Defendant
    CITY OF PALM SPRINGS, a public entity

1018121.1

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## 1. INTRODUCTION

Plaintiff Intervention911 (hereinafter referred to as "Intervention") runs two sober living facilities in Palm Springs. The City, based on information Intervention provided, determined these facilities fit no existing zoning category, but that they most closely resembled "assisted living facilities." That classification required Intervention to obtain conditional use permits (hereinafter referred to as "CUPs"). Intervention claims that its facilities more closely resemble "hotels" and that discriminatory animus against its recovering addict residents was a motivating factor in the City's classification decision, even though Intervention's own expert ultimately conceded the facilities are not hotels and that the "assisted living service" designation was not unreasonable in light of its use of the properties.

Separately, the Palm Springs Fire Department also determined that Intervention's use had changed (for purposes of the California Building and Fire Codes) to an "alcohol/drug abuse recovery facility" a new R4 and R2.1 use, necessitating the installation of sprinkler systems and other fire protection measures. Intervention argues discriminatory animus was a motivating factor for this decision as well.

The zoning and fire decisions allegedly violate the Federal Housing Act, Americans with Disabilities Act, and California Fair Employment and Housing Act. There is, however, no proper evidence of direct discrimination, but only speculation, misinterpretation, and innuendo. In the end, the evidence will show the City's decisions were based on proper classification criteria and factual material, not bias.

## 2. FACTUAL HISTORY

### A. Intervention911 and the Subject Properties

Intervention was founded by Ken Seeley in 2001 to conduct interventions with addicts. Since approximately 2008, Mr. Seeley has owned it in equal shares with Eric McLaughlin. In November of 2011, and March of 2012, respectively, Intervention

2

1018121.1

purchased and has continuously operated two properties in Palm Springs commonly known as The Alexander and The Palm Tee. The Alexander can accommodate 19 residents and the Palm Tee can accommodate up to 33 residents. Both properties are allegedly being operated as "Sober Living Facilities."

### B. Zoning at the Subject Locations

The Alexander is on land zoned for R2 under the Palm Springs zoning code. The Palm Tee is on land zoned for R2 and R3 uses. Per Section 92.03.00 of the Palm Springs Zoning Code, "R2" zones are "intended to provide for the development of medium - density multiple family residential uses." In the R2 zones, per Section 92.03.01 of the Palm Springs Zoning Code, permanent single family dwellings, multiple family dwellings, and hotels[1] are allowed as a matter of right, while assisted living facilities are allowed subject to approval of a CUP. Per Section 92.04.00 of the Palm Springs Zoning Code, "R3" zones are "intended to provide for the development of high density apartments, hotels, and similar permanent and resort housing and certain limited commercial uses directly related to the housing facilities." In the R3 zones, per Section 92.04.01 of the Palm Springs Zoning Code, multiple family dwellings and hotel facilities (provided that no more than 10% of the guest rooms contain kitchen facilities) are allowed as a matter of right, while assisted living facilities are allowed subject to approval of a CUP.

Zoning Code Section 91.00.10(B) defines "assisted living facility" as "a special combination of housing, supportive services, personalized assistance and health care licensed and designed to respond to the individual needs of those who need help with activities of daily living and instrumental activities of daily living. Supportive services are available twenty - four (24) hours a day to meet scheduled and unscheduled needs in a way that promotes maximum dignity and independence for each resident and involves the resident's family, neighbors and friends, and

---

[1] Provided that no more than 10% of the guest rooms contain kitchen facilities.

1018121.1

professional caretakers." The code defines "hotel" as "any building or portion thereof containing six (6) or more guest rooms used by six (6) or more guests, for compensation (excepting jails and hospitals), where provision for cooking may be made in a limited number of individual suites, and which rooms are designed and intended as temporary or overnight accommodations." The code defines a "multiple family dwelling" as "a building designed for or occupied by two (2) or more families living independently of each other"; a "dwelling unit" is "one (1) or more rooms and a single kitchen in a single - family dwelling, apartment house or hotel designed as a unit for occupancy by one (1) family for living and sleeping purposes."

### C.  Intervention's Occupancy at the Alexander and Palm Tee

Intervention refers to its Palm Springs properties as "Sober Living Homes" designed to help its clients "maintain their sobriety, regain the ability to live independently, and to enjoy productive lifestyles" as well to avoid relapse into addiction. This is accomplished in part with peer support, and in part by imposing a strictly structured environment. Part of that structure includes a regimented schedule that governs, for example, times for waking and sleeping, shower times, requires residents to be students, employed or seeking employment between 8:30 a.m. and 4:30 p.m. on weekdays, and to attend 12 - step meetings. Visitors are strictly limited, medications are locked up centrally and accessible only to plaintiff's staff, drug tests are daily and mandatory, sex (even between spouses or other consenting adults in private) is forbidden, and so forth.

There are a wide variety of rules for living at Intervention's properties, violation of any of which is cause for immediate expulsion without refund of any pre-paid rent. These rules include, but are not limited to: Only women can live at the Alexander (except some resident managers have been male); only men can live at the Palm Tee; showers are from 5 to 8 minutes long – total shower use for the day is no more than 15 minutes; resident managers may enter rooms (which are to remain unlocked) at any time to insure compliance with rules, residents' vehicles must be in good operating

4

condition and insured; residents' vehicles cannot be cars or motorcycles with modified engines; and children and teens under 18 are not allowed on site, even to visit their parents. Intervention has adduced testimony that these rules are applied sporadically, but they are nonetheless part of Intervention's operating procedures for a reason; they remain enforceable, and ostensibly a critical component of the addiction recovery process.

Additionally, at the time of the alleged discrimination, Intervention's website stated certain types of treatment were provided on site, including but not limited to nutritional planning, fitness, education, hypnosis, and life skills, as well as a detailed and regimented schedule for its residents. Intervention claims that no treatment has ever been provided on site, but the testimony of certain residents belies that representation. Even in its CUPs, which were eventually withdrawn, Intervention stated it was conducting or planned to conduct various types of activities clearly reeking of "treatment." Intervention claims those statements were only their "wish list." In any event, the City had every right to evaluate Intervention on the assumption that Intervention was truthful and not committing a false advertising tort.

To live at the Alexander or the Palm Tee, Intervention's clients are required to waive any rights they might otherwise have as renters and all search and seizure rights. Clients must make a mandatory monthly "donation" of approximately $2,800.00 per month if they wish to live with a roommate, and up to $5,600.00 if they want a room to themselves. Some of the residents pay less, one is currently on scholarship. The pricing is at odds with Intervention's claimed resemblance to a "hotel." Residents can be evicted with just 24 - hour notice for any violation of any rule except payment of rent. Violation of that promise results in eviction on one hour's notice. In all cases of eviction, the unearned balance remaining from that month's "donation" is kept by Intervention. Any property left on site is sold or destroyed within five days if the eviction is for any reason other than non-payment of rent, and within 24 hours if the eviction is for that reason.

Intervention argues its profit margin is smaller, the testimony of its owners in deposition showed a profit of about $29,000.00 per month at only 75% occupancy. Plaintiff clearly is still making money hand - over - fist and has never had any interference from the City. This Court already ruled on July 7, 2014, that Intervention failed to establish the accommodations it sought (to avoid the expense of complying with the zoning and PSFD decisions) were necessary to stay in business. Indeed, the evidence at trial will show that the CUP applications and fire protection measures were easily affordable is the lives and safety of plaintiff's disabled clientele were really important. There will be further evidence at trial that despite Intervention's assertions that it cares about people and that the City are bad actors, the opposite is true; rather, the evidence will show that Intervention cares more about its profit margin than the rights and safety of the community, including residents of its own properties.

### D. The Zoning Code and Building Code Disputes

In late 2011 and early 2012 the City received complaints from concerned citizens about their new neighbors. Some of these were legitimate complaints about impact on the community from potential noise, litter, or parking issues. Others were "NIMBY"[2] complaints based on unfounded and improper fears about the addicts moving in. All of the complaints were acknowledged and investigated, whether or not they were based on appropriate concerns. Intervention's architect (and now designated expert), Jim Cioffi, agreed it was "just good government" for the City to acknowledge and investigate all of these complaints, even the improper ones. He also conceded that he had no evidence whatsoever that the City actually relied upon any of these complaints (regardless of propriety) in making their decisions which Intervention challenges in this case; rather he only had an amorphous "feeling" that the City had done so. As such, the only evidence at trial will be that the NIMBY

---

[2] "Not In My Back Yard."

1018121.1

complaints were received and investigated, but there will be no actual evidence that the City's subsequent decisions were motivated by or based upon the biased complaints in any way.

On April 12, 2012, the City, after investigating and speaking with Intervention's principals, sent correspondence advising that both the Alexander and the then soon - to - be - opened Palm Tee facility would both require CUPs to operate as "assisted living facilities," and that applications should be made no later than May 1, 2012. On May 3, 2012, the City formally notified Intervention that the Alexander was in violation of Palm Springs Zoning Ordinance 92.02.01(C)(2).[3]

Intervention filed applications for CUPs for both facilities on June 25, 2012. The applications explicitly stated that, after they were granted, it was Intervention's intention to provide onsite treatment. The City sought additional information from Intervention, but the applications were ultimately withdrawn voluntarily on September 26, 2012. In withdrawing the applications, Intervention sent correspondence to the City taking the position that the facilities were "hotels" and not "assisted living."

Intervention's letter cited a list of "assisted living facility" traits under California Building Code section 310 including, but not limited to, assistance in dressing, grooming, bathing and other personal hygiene, central storing and/or distribution of medications, maintenance of house rules for the protection of clients, supervision of client schedules and activities, maintenance and/or supervision of client cash resources or property, monitoring food intake or special diet, and providing basic services required by applicable law and regulation to be provided by the licensee in order to obtain and maintain a community - care facility license. Their attorneys, in writing these and other letters blatantly misrepresented the true facts, as the evidence at trial will show.

---

[3]  According to the Zoning Code, any violation of the zoning code is, by definition of the term, a "public nuisance," and that is the term used in the standard violation notice form that is used not only in this case, but in every violation notice situation.

1018121.1

1    These criteria apply to "R4" and "R2.1" locations under California **Building
2    Code**, section 310, which is separate and apart from the Alexander and Palm Tee's R2
3    and R3 designations under the Palm Springs **Zoning Code**. The facts demonstrate
4    that, Intervention fulfilled most or all of the foregoing conditions of an assisted living
5    facility, because they either actually performed, claimed they performed, or professed
6    the intent to perform those activities.
7    On November 1, 2012, the City's Department of Planning Services wrote back
8    to Intervention's principals advising that it had reviewed the CUP applications and the
9    September 26, 2012, letter, and had concluded that the occupancies of these facilities
10   were inconsistent with the zoning code's definition of "hotel"; City staff noted that
11   Intervention's uses were more consistent with "assisted living facilities" and,
12   therefore, CUPs would be required.
13   Rather than reinstate the CUP applications it had already submitted,
14   Intervention appealed that determination on December 10, 2012, and the matter was
15   submitted to the City's Planning Commission. On December 12, 2012, the Planning
16   Director submitted a report to the Planning Commission which recommended a
17   finding that the facilities most closely resembled "assisted living facilities" and not
18   "hotels." There were many bases for this recommendation, including the fact that the
19   permit applications, as well as Intervention's marketing materials and website, stated
20   on - site treatment was occurring, and that the CUP applications indicated treatment
21   would be provided in the future. That day the Planning Commission continued the
22   hearing and directed staff to work with Intervention "on issues relating to zoning and
23   building requirements; and direct[ed] staff to provide further investigation on the
24   changes made on-site, as indicated by the applicant."
25   Meanwhile, on December 26, 2012, the Palm Springs Fire Department issued a
26   report citing the Alexander and Palm Tee for lacking required fire suppression
27   sprinkler systems based on the changes of occupancy to "sober living facilities" under
28   the California Building Code, which is, as previously noted, separate and distinct from

8

the Palm Springs Zoning Code. The PSFD's report stated that the reason the upgraded fire sprinklers were needed was that the facilities had converted to R4 uses[4] The code allows for the sprinkler requirement to be waived if, and only if, the applicant affirmatively proves to the satisfaction of the fire marshal that the particular **use** applicant intends is **less** hazardous (not equally hazardous) than the previous use. This recognizes an implied presumptive finding by the State Fire Marshall that any R4 use is presumed to be more hazardous than an R2 or R3 use, since higher standards of safety equipment is required. Intervention presented no evidence whatsoever to overcome this presumption, but merely asked for an exemption from the requirements via the "waiver." This was in the nature of a "request for reasonable accommodation," but this Court has subsequently summarily adjudicated that accommodation issue in the City's favor.[5]

In a letter dated January 22, 2013, Intervention requested that its properties be classified as "multiple family dwellings" as a reasonable accommodation under FEHA.[6] The January 23, 2013, report to the Planning Commission acknowledged the sprinkler issue, noted that this was independent of the zoning issue, and recommended that the Planning Commission affirm that the Intervention properties are best classified as "assisted living facilities."[7] The Planning Commission again continued

---

[4] In his original plans for the facilities, plaintiff's architect, Mr. Cioffi, had noted in his own hand that the proper classification was "R4."

[5] Plaintiff may reference the language of the fire marshal in denying the waiver, in order to show alleged discrimination. However, plaintiff may not reference the "waiver" provision in the code or its request for the accommodation under that code provision.

[6] While these reasonable accommodation requests were adjudicated against Intervention, the letters are still relevant as they demonstrate Intervention's self-serving flip flopping between different proposed classifications for itself, as well as representations about itself and its activities.

[7] No one claims that this classification or any other (including apartments of hotels) precisely fits the use to which plaintiffs have put the properties. Rather, as plaintiff's expert architect agrees, the law provides that, in such instances as here where the precise use in not mentioned at all, the Planning Director has the right to exercise his sole discretion is deciding if the use closely resembles some use which is mentioned and which one, and then to classify the use in that way.

the matter to February 13, 2013.

On February 5, 2013, Intervention wrote again promising a revised business model that would supposedly more closely resemble a hotel. The February 13, 2013, report to the Planning Commission acknowledged the issue with Intervention's failure to comply with the California Building Code, stated that the Commission had sufficient information to rule on the appeal, and again recommended classifying the subject properties as "assisted living facilities."

At the meeting, itself, there was testimony from residents who lived near either the Alexander or the Palm Tee, only one neighbor voiced the inappropriate concern over the mere presence of addicts living there; in fact, that complaint was specifically derided by the City Council in a later meeting. (These meetings, at which plaintiff's owners openly argued that the facilities were neither apartments nor hotels, but, instead, were "sober living rentals," were videotaped and will be played into evidence at trial, at least in part.) The vast majority of the concerns expressed focused on ancillary impacts on the community, such as parking, trash, noise, etc. Residents of both facilities testified about the benefits of their living situation. A representative from the City's Fire Department testified that the buildings' sprinklers required upgrades, regardless of whether they were deemed "hotels," "assisted living," "apartment housing," or something else under the zoning code, because the sprinkler need was based on changed occupancy from R2 hotels to R4 alcohol/drug abuse recovery facilities under the California Building Code. The Commission voted 6 to 1 against deeming the facilities "hotels."

While Intervention's appeal of the Commission's decision was pending, on April 3, 2013, it sent a follow - up request for a reasonable accommodation under FEHA, again seeking reclassification, this time as a "multi - family unit." Later that day the City Council heard and denied Intervention's appeal. The staff report to the City Council set forth support for the recommendation of staff and the final decision of the City Council. It was a lengthy and detailed report citing a variety of factual

1018121.1

bases for the recommendation, **none of which** had anything to do with either the NIMBY complaints or the residents' protected status.

At that City Council meeting, representatives of Intervention and clients staying at both facilities testified on Intervention's behalf. City Councilmember Foat explicitly stated she was disgusted by and disagreed with those neighborhood residents who voiced fear about the facilities based on the disability (addiction) of plaintiff's clientele, a sentiment echoed by Councilmember Lewin. No one defended those residents' complaints. The only neighborhood resident who spoke at the meeting voiced **no** concern over the disabled status of Intervention's clients, and voiced instead a hope that they would play a larger role in community openness and friendship. While the City was aware of the need for fire protection measures, it was not of concern vis-à-vis the City Council's decision, because the zoning code and the building code are separate issues. The City Council acknowledged that neither the designation of "hotel" nor "assisted living facility" were a perfect match for Intervention's occupancy. The City Council voted unanimously to uphold the Planning Commission's decision. It also made some allowances to keep Intervention in business. First, Intervention would need to submit a new CUP application as an "assisted living facility," but, because it had paid the fee for the original, withdrawn CUPs, the City agreed plaintiff would not have to pay the filing fees a second time. Second, the City agreed that no code enforcement action would be taken against Intervention pending resolution of the problem. To this day, the City has never taken any such enforcement action, and has not in any way interfered with the operation of plaintiff's properties as Sober Living Facilities.

### E. The Allegations

This action was subsequently filed on July 3, 2013. It alleged facial and as-applied violations of the Fair Housing Act, discrimination under the Americans with Disabilities Act, and violation of the California Fair Employment and Housing Act. (Plaintiff later confirmed it did not wish to proceed with any "facial" claims.)

11

Intervention also raised a claim that the City failed to make reasonable accommodations, which allegation was subsequently summarily adjudicated in the City's favor.

### F.     Plaintiff and its Expert Concede "Assisted Living" Is a Reasonable Classification

As noted above, Intervention's co-owner Mr. Seeley testified before the Planning Commission that the Alexander and Palm Tee are not operating as hotels. He made the same concession in deposition multiple times. On April 18, 2014 plaintiff designated three experts, only one of whom, Jim Cioffi, was designated to opine on the hotel/assisted living designation issue. Mr. Cioffi was deposed twice, once as an expert and once as a percipient witness.

In his percipient witness deposition he admitted that, while in his personal opinion he thought the facilities most closely resembled hotels, the Planning Director's classification of the facilities as most closely resembling assisted living facilities was not unreasonable, but just a difference of opinion. He also testified that the discretion to determine such a classification resided with the City, not the applicant. As noted above, he also conceded he had no evidence beyond his subjective feelings to link the NIMBY complaints to the City's classification decisions. To date, plaintiff has not submitted another CUP application, nor taken any action to reactivate the earlier applications.

### 3.     THERE IS NO COMPETENT EVIDENCE THAT DISCRIMINATORY ANIMUS WAS A MOTIVATING FACTOR IN THE CITY'S DECISIONS

As a preliminary matter, although Intervention raises separate claims under the FHA, ADA, and FEHA, the fundamental analysis under all three statutes is the same. (Pacific Shores Properties, LLC v. City of Newport Beach, 730 F.3d 1142, 1156 (9th Cir. 2013); citing McGinest v. GTE Service Corp., 360 F.3d 1103, 1124 (9th Cir.2004), and Walker v. City of Lakewood, 272 F.3d 1114, 1131 n. 8 (9th Cir.2001))

A plaintiff may prevail by producing "direct or circumstantial evidence

1018121.1

demonstrating that a discriminatory reason more likely than not motivated" the challenged decision. (McGinest v. GTE Service Corp., 360 F.3d 1103, 1122–23 (9th Cir. 2004))

When plaintiffs rely on this "direct or circumstantial evidence" approach, discriminatory intent is determined by evaluating, among other things: (1) "[t]he historical background of the decision," (2) "[t]he specific sequence of events leading up to the challenged decision," and (3) defendant's departures from its normal procedures or substantive conclusions" (Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 266 (1977))[8] For nearly 52 years "the Supreme Court has made clear that its cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a ... discriminatory purpose, is unconstitutional **solely** because it has a ... disproportionate impact …. [P]roof of … discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." (Diaz v. Brewer, 676 F.3d 823 (9th Cir. 2012), citing Arlington Heights, supra, at 265.)

On summary judgment this Court identified possible sources of this circumstantial evidence which, cobbled together, were minimally sufficient to create a triable question of fact concerning discrimination: the NIMBY complaints, lack of CUP requirements for other Palm Springs sober living facilities, possible misclassification of the facilities as "assisted living facilities," and "unusual" interest from City higher - ups. Each one is addressed below:

---

[8] Of course, a departure from normal procedures may or may not evidence bias. For example, in this case, from the outset, plaintiff resorted to attorneys and implied threats of litigation. That is why the City employees wanted to make sure all concerned parties were "in the loop," even though some of those parties were not usually "in the loop" that early.

There are two other factors under the Arlington Heights test which were wisely abandoned by Intervention at the summary judgment stage, so they are not addressed here.

1018121.1

### A. NIMBY Complaints and Disparate Treatment of Third Party Sober Living Facilities

As the Court correctly noted in its ruling "[E]ven where individual members of government are found not to be biased themselves, liability may still be imputed where discriminatory governmental actions are **in response to** significant community bias."  (Tsombanidis v. City of West Haven, Conn., 129 F.Supp.2d 136, 152 (D. Conn. 2001), emphasis added.)  It is thus Intervention's burden to establish that it is in fact the **bias** to which the City is actually **responding**.  As this Court noted, "the letters and emails [alone] from community members **do not prove that the City discriminated** against Intervention" though they may be "probative of animus within the community, which [,in turn,] may provide circumstantial evidence of discrimination by the City." (7/7/14 Order on Summary Judgment, fn. 25, p.7, ln. 15-17, emphasis added)

Given the consistent flat statement from all City employees involved that there was no such reliance or animus, and Mr. Cioffi's concession that there is no such actual evidence of this link apart from his own subjective and inadmissible emotional "feelings," the NIMBY complaints do not serve to buttress the differential treatment as required by the Court's order.  Therefore both types of evidence must fall by the wayside as immaterial; they are probative of nothing other than community feelings for which the City is not vicariously liable.[9]  This is especially true in light of the Court's reasoning above.

Moreover, the Court also noted that the alleged differential treatment of third party sober living facilities would be "more probative of discriminatory intent if the comparison group did not consist of other sober living facilities" and that the actual comparison only raised a question of fact "when viewed in the larger context of

---

[9] The Court acknowledged Cioffi's concession, but was unable to consider it in ruling on the City's motions *in limine,* because the subject testimony was only available at the reply brief stage.

14

1018121.1

neighborhood opposition to the facilities and the City's response to those complaints." (Order, 41:25-42:4)

But as Mr. Cioffi also conceded, the complaints merely were an acceptable catalyst for the City's investigation, because it is "just good government" for the City to receive and investigate all claims. The investigation of some of those claims yielded evidence that Intervention's facilities were not in compliance with the zoning and building codes. There is no competent evidence to corroborate Mr. Cioffi's subjective "feeling" that the City put its thumb on the scale, let alone that it did so to enable the biased complainers' prejudices. His argument is that the community voiced a bias and that the City made zoning decisions, but he can only speculate that the former was, in fact, a motivating factor for the latter.

As a result the NIMBY complaints are divorced from the City's decision - making, and do not connect to the alleged differential treatment. Moreover for the differential treatment to be relevant, there would need to be some evidence the City was aware of the other facilities, that they needed CUPs for similar reasons as Interventions', and that the City was aware of that need. Without any complaints to catalyze the City's investigation into those facilities, they remained mostly essentially unknown to the City's zoning personnel and were thus a non - factor. The other facilities thus are not probative.

### B. The Admittedly Reasonable Classification

Mr. Cioffi (as well as plaintiffs other experts to the extent they intended to offer such opinions) was deemed wholly unqualified to render a legal opinion as to what the proper zoning or Building/Fire Code classifications should be and, thus, Intervention has no testimony on this topic. Even if Cioffi was allowed to so opine, he has already acknowledged that the "assisted living facility" designation by the City was not unreasonable. As the Court correctly noted "An **unreasonable** classification of a facility for zoning purposes that requires that it obtain a special zoning exemption or undertake costly upgrades can likewise demonstrate discriminatory intent." (See,

Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Commission of Fairfield, 790 F.Supp.1197, 1212 - 1216 (D. Conn. 1992), emphasis added)  The inverse of this also must necessarily be true.  A classification of a facility for zoning purposes that is admitted not to be unreasonable and requires that it obtain a special zoning exemption or undertake costly upgrades **cannot** demonstrate discriminatory intent.  As such, there is no dispute about the reasonableness of the City's classification and the NIMBY complaints cannot be added to them to create relevance.

Second, the Court noted that Intervention adduced evidence that the City "relied" on the fact that certain treatment services were being provided when, in fact, none were. (Order 40:11-13)  But whether or not Intervention actually provided these services is irrelevant, because Intervention said they were providing those services and would do so in the future.  One cannot affirmatively attempt to mislead another into a misconception, and then, when successful in that attempt, crucify the duped party for reaching the "erroneous" belief.

Intervention promulgated advertising materials on its website stating it **was performing** such services, and the City had the right to rely on those public representations as truthful.  Second, even if Intervention were not performing such services at the time, its CUP applications explicitly stated it intended to provide such service in the future.  As such, whether Intervention was **actually** providing those services was irrelevant to the analysis, because the result would be the same.  At trial, the City also anticipates there will be evidence that, in fact, there was treatment occurring onsite anyway.

### C. "Unusual" Interest from City Higher - Ups

One of the Arlington Heights factors is "departure from normal procedures."  Intervention argues that because planning director Craig Ewing (and others) emailed City higher – ups, including the City manager and mayor about the status of the CUP applications, something he usually did not do at that stage of the proceedings, that this departure satisfies that prong of the Arlington Heights test.  But, like the above

situation where plaintiff criticizes the City for reasonably reacting to plaintiff's own conduct and representations, this an argument is a complete misinterpretation of the evidence. City employees will testify precisely as to why he undertook to keep his superiors aware of these particular applications --- from the beginning, plaintiff impliedly threatened legal action and expressly involved litigators in the proceedings, creating a reasonable concern in Mr. Ewing to which he reasonably reacted. The end result is that Intervention is left with only speculation that the City discriminated against it, while the City has a plethora of valid unbiased reasons for its zoning and fire code classifications.

## 4. LACK OF DAMAGES

Even if Intervention were to prevail, it would need to present some evidence of actual damages. Intervention purportedly lost the opportunity to lease the Alexander and Palm Tee to a third party. This is problematic for two reasons. First, based on Intervention's testimony about its income and expenses, the leases were a terrible deal and would have resulted, if anything, in a loss of profits. Moreover, to substantiate this claim, Intervention would need to present evidence that the lease fell through because of the City. This cannot be done by hearsay or speculative testimony of the plaintiff's owners, and no other witnesses or evidence has heretofore been revealed on the topic.

Intervention also claims to have lost approximately $200,000.00 in marketing opportunities and pre - litigation attorney fees. Not one iota of evidence was presented on this topic in Rule 26 disclosures or testimony prior to discovery cutoff. Indeed, the City was not even allowed an opportunity to challenge this by way of a motion *in limine*, since it was only at the Final Pre - Trial Conference on August 4 that the Intervention revealed this damage theory in answer to a direct question from the Court as to claimed damages. This should not be recoverable.

## 5. CONCLUSION

Intervention wants to argue that the City is trying to run it out of town, but that

1018121.1

is simply untrue.  The City merely requires that Intervention obtain permits to operate its facilities based on a change of use to an admittedly reasonable zoning category, and that it upgrade its fire safety equipment to safeguard the lives of the people it purports to care about most.  This is not discrimination.  This is typical unbiased categorization by the City of Palm Springs, no more, no less.

DATED:  August 19, 2014          WOODRUFF, SPRADLIN & SMART, APC

　　　　　　　　　　　　　　　　　By: /s Robert L. Kaufman
　　　　　　　　　　　　　　　　　　ROBERT L. KAUFMAN
　　　　　　　　　　　　　　　　　　DOUGLAS J. LIEF
　　　　　　　　　　　　　　　　　　Attorneys for Defendant
　　　　　　　　　　　　　　　　　　CITY OF PALM SPRINGS, a public entity

1018121.1

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF ORANGE

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF, SPRADLIN & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On August 19, 2014, I served the foregoing document(s) described as **CITY OF PALM SPRINGS'TRIAL BRIEF**

☐   by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐   **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of WOODRUFF, SPRADLIN & SMART for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒   **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☐   **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _____ to receive said documents, with delivery fees provided for. I am readily familiar with the practices of WOODRUFF, SPRADLIN & SMART for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by _____ on said date in the ordinary course of business.

☐   **(BY FACSIMILE)** I caused the above-referenced document to be transmitted to the interested parties via facsimile transmission to the fax number(s) as stated on the attached service list.

☒   (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on August 19, 2014, at Costa Mesa, California.

s/ Gloria V. Herrera
GLORIA V. HERRERA

1018121.1

19

<u>**INTERVENTION911, et al. v. CITY OF PALM SPRINGS, et al.**</u>

**ASSIGNED TO HON. MARGARET M. MORROW
COURTROOM 780
MAGISTRATE JUDGE OSWALD PARADA
COURTROOM 3**

**USDC, CENTRAL DISTRICT OF CALIFORNIA
CASE NO. EDCV13-01117 MMM (OPx)**

<u>**SERVICE LIST**</u>

| | |
|---|---|
| David L. Baron<br>Brent C. Clemmer<br>SLOVAK BARON EMPEY MURPHY & PINKNEY LLP<br>1800 E. Tahquitz Canyon Way<br>Palm Springs, CA 92262<br>Telephone: (760) 322-2275<br>Facsimile: (760) 322-2107<br>baron@sbelawyers.com<br>clemmer@sbelawyers.com | Attorneys for Plaintiff<br>**INTERVENTION911, a California corporation** |
| Ethan J. Loeb<br>SMOLKER, BARTLETT, SCHLOSSER, LOEB & HINDS, P.A.<br>500 E. Kennedy Bl., Suite 200<br>Tampa, FL 33602<br>Telephone: (813) 223-3888<br>Facsimile: (813) 228-6422<br>ethanl@smolkerbartlett.com<br>JessicaS@smolkerbartlett.com | Attorneys for Plaintiff Pro Hac Vice<br>**INTERVENTION911, a California corporation** |
| Steven G. Polin<br>LAW OFFICE OF STEVEN G. POLIN<br>3034 Tennyson Street, NW<br>Washington, DC 20015<br>Telephone: (202) 331-5848<br>Facsimile: (202) 331-5849<br>spolin2@earthlink.net | Attorneys for Plaintiff Pro Hac Vice<br>**INTERVENTION911, a California corporation** |

08/29/13

1018121.1