**O**

# United States District Court
# Central District of California

| | |
|---|---|
| INTERVENTION911, | Case № 5:13-cv-01117-ODW(SPx) |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT [183]** |
| v. | |
| CITY OF PALM SPRINGS, | |
| Defendant. | |

## I.    INTRODUCTION

Before the Court is Defendant City of Palm Spring's Motion to Enforce the Settlement Agreement.  (ECF No. 183.)  Following a three-year dispute between the City and Plaintiff Intervention911 over the proper zoning classification for two sober living facilities, the parties agreed to a one and one-half page "Mediation Plan" that lays out a complex path to settlement.  The Mediation Plan required, among other things, that "[t]he City's clerk, manager, and attorney . . . recommend a waiver of any requirement of upgrades under the current state fire code."  The question now is to *whom* that recommendation must be made—the City contends that the recommendation must be made to the City Council, whereas Intervention911 contends that the recommendation must be made to the State of California.  Because neither the words of the agreement nor the context in which the agreement was made clarifies the

issue, the Court concludes that the Mediation Plan is void and unenforceable.  As a result, the Court **DENIES** the City's Motion.  (ECF No. 183.)

## II.    FACTUAL BACKGROUND

### A.    Pre-Litigation Dispute

Between 2011 and 2012, Intervention911 opened two sober living facilities in Palm Springs, California.  (Mot. for Summ. J. Order at 2–3, ECF No. 92.)  Soon after, persons living near the facilities lodged complaints with the City, most of which focused on the residents' fear that the facilities would increase crime in the neighborhood, or would otherwise cause a nuisance.  (*Id.* at 6–9.)

The sober living facilities are located on land zoned for "R2" use.[1]  On R2-zoned land, hotels are permitted to operate as a matter of right, while other uses, such as assisted living facilities, must obtain a conditional use permit ("CUP").  (*Id.* at 10–11.)  The terms "hotel" and "assisted living facility" are defined in the City's zoning code, and where a facility does not fit neatly within either definition, the code grants the City's Planning Director authority to determine its classification.  (*Id.* at 11.)

In April 2012, the City informed Intervention911 that it considered the facilities to be "assisted living facilities," and thus that Intervention911 was required to apply for a CUP.  (*Id.* at 11–12.)  In June 2012, Intervention911 applied for the CUP.  (*Id.* at 12.)  The City declined to recommend approval of the CUP applications.  (*Id.*)  Intervention911 then withdrew its applications and sent a letter to the City, arguing that the facilities be treated as "hotels" rather than "assisted living facilities," thereby allowing them to operate as a matter of right in the R2 zone.  (*Id.*)  The City again declined to treat them as hotels instead of assisted living facilities.  (*Id.*)

Separately, in December 2012, the City's Fire Department decided to reclassify the facilities as drug abuse recovery and treatment facilities.  (*Id.* at 14–16.)  This required Intervention911 to upgrade certain fire safety equipment on the premises,

---

[1] One of the facilities is also zoned for R3 use.

including installing automatic fire sprinkler systems and fire alarm and detection systems. (*Id.*) The Fire Department has the discretion to waive the upgrade requirement if it determines that the new use is less hazardous than the prior use. Here, it determined that a drug abuse recovery and treatment facility was not less hazardous than the prior use. (*Id.*)

**B.     Pre-Settlement Procedural History**

In June 2013, Intervention911 filed suit against the City, alleging intentional discrimination and failure to provide a reasonable accommodation under the Fair Housing Act, the Fair Employment and Housing Act, and the Americans with Disabilities Act. (ECF No. 1.) On July 7, 2014, the Court granted summary judgment on Intervention911's reasonable accommodation claims. (ECF No. 92.) The remaining claims were set for trial in September 2014. However, on August 21, 2014, after an extensive mediation, the parties agreed to the Mediation Plan and the Court vacated the trial date. (ECF Nos. 155–56.)

**C.     The Mediation Plan**

The Mediation Plan is a one and one-half page document that lays out a complex path to resolution of the lawsuit. Under the Mediation Plan, the City would first reactivate Intervention911's CUP applications for consideration. (Kaufman Decl. Ex. C. ¶ 2, ECF No. 183-3.) In addition, "[t]he City's clerk, manager, and attorney will also recommend a waiver of any requirement of upgrades under the current state fire code and that the Fire Department rescind the December 26, 2012, memorandum." (*Id.* ¶ 3.)

Moreover, the City's clerk, manager, and attorney "shall" recommend to the City Planning Commission and City Council approval of the CUP applications "with any conditions deemed appropriate." (*Id.* ¶ 2.) However, before any submission to the City Planning Commission and City Council, the City must first submit the conditions to Intervention911's counsel for review. (*Id.* ¶ 2.) Intervention911's counsel "may" accept or reject any of the conditions. (*Id.* ¶ 6.) If the "final authority"

1  (presumably the City Council) approves the permits *without* modifications, then

2  Intervention911's acceptance of the conditions "will be final." (*Id.*) If, however, the

3  "final authority" approves the permits *with* modifications, then Intervention911 shall

4  still have "the sole and absolute discretion to reject the permits." (*Id.*) If

5  Intervention911 accepts the modifications, then the Mediation Plan becomes a final

6  settlement agreement, and the parties must move onto the next phase of the settlement.

7  (*Id.* ¶¶ 6, 7.) The next phase of the settlement requires Intervention911 to move for an

8  award of attorney's fees, which the City may contest on any grounds except whether

9  Intervention911 is the prevailing party. (*Id.* ¶ 8.)

10  **D.    Post-Settlement Procedural History**

11        The City reactivated the CUP applications and recommended approval of the

12  applications. (*See* Kaufman Decl. ¶¶ 5A, 5B.) The Planning Commission approved

13  the CUPs with several conditions, two of which are relevant here: (1) that

14  Intervention911 install fire sprinklers, and (2) that Intervention911 install an

15  automatic interconnected smoke detector system. (*Id.* ¶ 5B.) Intervention911

16  appealed the Planning Commission's decision to the City Council. (*Id.* ¶ 5C.) While

17  the matter was before the City Council, the Fire Department recommended that the

18  City Council remove conditions relating to the fire system upgrades. (*Id.* ¶ 5D.) The

19  City Council ultimately removed both conditions. (*Id.*) It appears that

20  Intervention911 accepted the City Council's determination regarding these two

21  conditions. (*Id.*)

22        During summer 2015, an issue regarding licensure by the State of California

23  arose. (*See id.* ¶ 6.) Intervention911 required a license from the State to operate as a

24  treatment center, and in order to obtain this license, the City was required to verify to

25  the State that the facility complies with the relevant building and fire codes. (*See id.*

26  ¶¶ 6, 7; Loeb Decl. ¶ 12, ECF No. 187.) The City declined to make this verification

27  for essentially the same reason it did in December 2012—because Intervention911

28  was seeking to treat persons, the premises needed to be reclassified to a treatment

facility.   (Kaufman Decl. ¶¶ 7–8.)   Under 24 C.C.R. § 102.3, the change in classification required the facilities to comply with all relevant state fire codes and regulations, which the facilities did not at the time.  Moreover, the Fire Department declined to waive the upgrade requirement, presumably because the conditions for waiver were again not met.  (Loeb Decl. ¶ 4; Seeley Decl. ¶ 18.)  The City offered to jointly request an interpretation from the State of the relevant regulation, but Intervention911 rejected that offer.  (Kaufman Decl. ¶¶ 9–10; Loeb Decl. ¶ 6.)  This Motion followed shortly thereafter.

## III.   LEGAL STANDARD

"It is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it."  *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987).  "A motion to enforce a settlement agreement essentially is an action to specifically enforce a contract, and an action for specific performance without a claim for damages is purely equitable and historically has always been tried to the court.   Accordingly, the court may hear evidence and make factual determinations."  *Fair Hous. Council of Cent. Cal., Inc. v. Tylar Prop. Mgmt. Co.*, 975 F. Supp. 2d 1115, 1117–18 (E.D. Cal. 2012) (internal citations, brackets, and quotation marks omitted).[2]

"The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally."  *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).  "[T]he mutual intention of the contracting parties at the time the contract was formed governs.  We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates."  *Emps. Reinsurance Co. v.*

---

[2] Although a district court is generally required to hold an evidentiary hearing where, as here, there is a dispute as to the material terms of the settlement, *Callie*, 829 F.2d at 890, neither party here requested an evidentiary hearing.  *See Calcor Space Facility, Inc. v. McDonnell Douglas Corp.*, 5 F. App'x 787, 789 (9th Cir. 2001) (evidentiary hearing not required where parties did not request such a hearing, and where district court heard oral argument from the parties' counsel).

*Superior Court*, 161 Cal. App. 4th 906, 919 (2008).  "We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation.  We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage."  *Id.*

If there is any ambiguity in the language of the contract, the parties may introduce extrinsic evidence to clarify the ambiguity.  Extrinsic evidence is evaluated using a two-step process: "First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine ambiguity, i.e., whether the language is reasonably susceptible to the interpretation urged by a party."  *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004) (internal brackets and quotation marks omitted).  "If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract."  *Id.*  However, while "extrinsic evidence can be admitted to explain the meaning of the contractual language at issue, . . . it cannot be used to contradict it or offer an inconsistent meaning."  *Hot Rods, LLC v. Northrop Grumman Sys. Corp.*, 242 Cal. App. 4th 1166, 1175–76 (2015).

## IV.   DISCUSSION

The City argues that paragraph 3 of the Mediation Plan required it to recommend to the City Council and/or the Planning Director a waiver of sprinkler upgrades only as part of the CUP application, which the City has done. Intervention911 counters that paragraph 3 of the Mediation Plan requires the City to recommend to the State a waiver of fire safety upgrades, which the City has not done. Because neither the words of the agreement nor the context in which the agreement was made sheds any light on the question, it appears the parties simply did not reach an agreement on the issue.  And because this is a material term of the settlement, the Court concludes that the agreement is void and unenforceable.

"'[T]he law of contracts precludes specific enforcement of a contract when it cannot be determined exactly what terms the parties agreed upon.'" *Terry v. Conlan*, 131 Cal. App. 4th 1445, 1459 (2005) (quoting *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 801 (1998)); *see also* Restatement (Second) of Contracts § 33 (Am. Law Inst. 1981) ("[T]he terms of the contract [must be] reasonably certain . . . The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."); *Ladas v. Cal. State Auto. Ass'n*, 19 Cal. App. 4th 761, 770 (1993) ("Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable."); *Cal. Lettuce Growers v. Union Sugar Co.*, 45 Cal. 2d 474, 481 (1955).  Moreover, "[a]lthough a judge hearing a [motion to enforce a settlement] may receive evidence, determine disputed facts, and enter the terms of a settlement agreement as a judgment, nothing . . . authorizes a judge to *create* the material terms of a settlement, as opposed to deciding what terms *the parties themselves* have previously agreed upon." *Weddington Prods., Inc.*, 60 Cal. App. 4th at 810 (citations omitted).

Traditional tools of contract interpretation do not clarify the entity to which the recommendation must be made.  To state the obvious, the Mediation Plan does not explicitly state to whom the recommendation must be made.  Moreover, the language and purpose of the agreement cut both ways.  For example, paragraph 2 discusses "recommendations" that the "City's clerk, manager, and attorney" should make with respect to the conditions on the CUP applications.  The fact that paragraph 3 uses substantially similar language—i.e. the "City's clerk, manager, and attorney" must make a "recommendation" regarding waiver of upgrades—suggest that this is part and parcel of the CUP application.  *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 526 (2003) ("[A]n identical phrase or word used in a contract [should] be given the same meaning throughout the contract in the absence of anything in the contract suggesting otherwise."); *Palmer v. Truck Ins. Exch.*, 21 Cal.

4th 1109 (1999).  Similarly, paragraph 6 discusses how Intervention911 may accept or reject the conditions recommended "as set forth in paragraph 2 and 3."  There would be no reason for Intervention911 to review (and have the opportunity to reject) a waiver that was being sent to the State for licensure purposes, thus also suggesting that the recommendation was part of the CUP application.  Finally, if it is Intervention911's contention that the Fire Department has the *sole* ability to waive State law fire upgrade requirements, paragraph 3 should require the "Fire Department" to make the recommendation, not the "City's clerk, manager, and attorney."[3]

However, other considerations support Intervention911's position.  First, paragraph 3 requires the City to "recommend a waiver of *any* requirement of upgrades under the current state fire code," and does not specifically limit this waiver to the CUP applications.  (*Id.* ¶ 3 (emphasis added).)  Second, the fire system upgrade conditions that were originally attached to the CUP applications (and of which the City ultimately did recommend a waiver) were not "state fire code" upgrades, which suggests that the disputed provision did not relate to the CUP applications.  Third, if the City does not have the authority to waive state fire regulations, as it now contends, it is unclear why the City would have agreed to the language in paragraph 3, which unambiguously requires the City to waive (in *some* manner) upgrades under the "state fire code."

Finally, the City's interpretation of the agreement substantially defeats a major purpose of the agreement, which apparently was to operate the two facilities as treatment centers.  There is no reason why Intervention911 would demand, as part of the settlement, that the City only waive the fire upgrade requirements as part of the CUP process and not waive upgrade requirements under the state fire code.  *Both* are required in order for Intervention911 to operate as a treatment center without extensively upgrading its fire safety systems.  (Seeley Decl. ¶ 19.)  Having one is

---

[3] In fact, if the Fire Department has the sole ability to waive state law fire upgrades, it would not need to "recommend" a waiver to anyone—the Fire Department just waives it.

useless without the other, and thus it is unclear why Intervention911 would bargain for one and not the other.  Indeed, the apparent purpose of rescinding the December 26, 2012, memorandum was so that Intervention911 did not have to upgrade its fire system (whether for state licensure purposes or otherwise), and the fact that the waiver recommendation is part of the same sentence as the rescission requirement suggests the two were connected and were made for the same purpose.  Thus, the City's refusal to waive upgrade requirements under the state fire code is inconsistent with both the wording and the purpose of the agreement.

In light of the above, the Court cannot determine with any certainty what a reasonable person in the parties' positions would have understood as to whom the City was required to recommend a waiver of fire safety upgrades.  Thus, "the essential terms [of the settlement] are so uncertain that there is no basis for deciding whether the agreement has been kept or broken."  Restatement (Second) of Contracts § 33 cmt. a (Am. Law Inst. 1981).  As a result, "there is no contract."  *Id.*

## V.   CONCLUSION

For the reasons discussed above, the Court **DENIES** the City's Motion to Enforce the Settlement Agreement.  (ECF No. 183.)


**IT IS SO ORDERED.**


August 9, 2016

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**