ROBERT L. KAUFMAN – State Bar No. 66389
rkaufman@wss-law.com
DOUG J. LIEF - State Bar No. 240025
dlief@wss-law.com
WOODRUFF, SPRADLIN & SMART, APC
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Telephone: (714) 558-7000
Facsimile: (714) 835-7787

Attorneys for Defendant CITY OF PALM SPRINGS, a public entity

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERVENTION911, a California corporation,<br><br>Plaintiff(s),<br><br>v.<br><br>CITY OF PALM SPRINGS, a California Charter city,<br><br>Defendant(s). | CASE NO.: EDCV13-01117 MMM (OPx)<br><br>BEFORE THE HON. OTIS D. WRIGHT, II COURTROOM 5D<br><br>**CITY OF PALM SPRINGS' REPLY IN SUPPORT OF MOTION TO PARTIALLY VACATE/MODIFY JUDGMENT PURSUANT TO *FEDERAL RULE OF CIVIL PROCEDURE* 60(A) AND/OR 60(B)(6)**<br><br>HEARING DATES PENDING:<br>Type: City's Partial Motion to Vacate/Modify<br>Date: July 13, 2020<br>Time: 1:30 p.m.<br>Courtroom: 5D |

TO PLAINTIFF AND TO ITS ATTORNEYS OF RECORD:

Defendant CITY OF PALM SPRINGS, a public entity (hereinafter referred to as the "City"), hereby submits is reply in support of its motion for a partial vacation or modification of the judgement entered in this case on April 16, 2020, under Rules 60(a) and/or 60(b)(6) of the *Federal Rules of Civil Procedure*.

1500424.1

1

| | | |
|---|---|---|
| 1 | Dated: June 24, 2020 | WOODRUFF, SPRADLIN & SMART, APC |
| 2 | | |
| 3 | | By: */s Robert L. Kaufman* |
| | | ROBERT L. KAUFMAN |
| 4 | | DOUGLAS J. LIEF |
| 5 | | Attorneys for Defendant CITY OF PALM SPRINGS, a public entity |

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1500424.1

2

# TABLE OF CONTENTS

**Page**

1. INTRODUCTION …………………………………………………………6
2. 911'S ARGUMENT RE MUNICIPAL CODE SECTION 93.23.19 IS A NON-SEQUITUR, AND MANIFESTLY WRONG ON MULTIPLE GROUNDS..................................................................................................7
3. THERE IS NO "INEQUITY" IN AWARDING THE CITY ITS COSTS…..11
4. THE CASE DOES NOT FIT INTO THE DEFINITION OF AN "IMPORTANT" CIVIL RIGHTS CASE FOR PURPOSES OF DENYING THE PREVAILING PARTY ITS PRESUMPTIVE COSTS…...13
5. THE COSTS CLAIMED ARE NOT UNREASONABLE…………………..16
6. CONCLUSION ………………………………………………………….. 17

WOODRUFF, SPRADLIN & SMART
ATTORNEYS AT LAW
COSTA MESA

1500424.1

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Andretti v. Borla Performance Industrias, Inc.*, 426 F.3rd 824, 836 ............................ 11

*Arley v. United Pacific Insurance Co.*, 379 F.2nd 183, 186-187 (9th Cir.1967) ............ 10

*Association of Mexican-American Educators v. State of California*, 231 F.3rd 572, 593 (9th Cir. 2000) ........................................................................................ 6, 14, 15

*Braxton v. United Parcel Service, Inc.*, 148 F.R.D. 527, 528-529 (E.D.Pa. 1993) ...... 12

*Cherry v. Champion International Corp.*, 186 F3rd 442, 448 (4th Cir. 1999) .............. 16

*Coulter v. Newmont Gold Co.*, 873 F.Supp. 394 (D.Nev. 1994) ................................. 12

*Delta Air Lines, Inc. v. Aug.*, 450 U.S. 346, 355, fn. 14 (1981) .................................. 16

*Draper v. Rosario*, 836 F.3rd 1072, 1088 (9th Cir. 2016) ............................................ 15

*English v. Colorado Department of Corrections*, 248 F.3rd 1002, 1013 (10th Cir. 2001) ................................................................................................................ 15, 16

*Knox v. City of Fresno*, 208 F.Supp.3rd 1114, 1116 (E.D.Cal. 2016) .......................... 15

*Mitchell v. City of Moore, Oklahoma*, 218 F.3rd 1190, 1204 (10th Cir. 2000) .............. 16

*Rivera v. NIBCO*, 701 F.Supp.2nd 1135, 1142 (E.D.Cal. 2010) .................................. 15

*Smith v. International Longshoremen's Association*, 592 F.2nd 225, 226 (4th Cir.1979) ........................................................................................................................ 10

*SoCal Recovery, LLC, et al., v. City of Costa Mesa*, No. 19-56077, 2020 WL 3057517, at *1 (9th Cir., June 9, 2020) .................................................................... 14

*Stanley v. University of Southern California,* 178 F.3rd 1069, 1079 (9th Cir. 1999) 6, 15

*Vasquez v. Davis*, 226 F.Supp.3rd 1189, 1225, fn. 23 (D.Colo. 2016) ........................ 15

*Vietnam Veterans of America. v. C.I.A.*, 288 F.R.D. 192, 202-203 (N.D.Cal. 2012) .. 10

**FEDERAL STATUTES**

Federal Rule of Civil Procedure Rule 8(a, e) .............................................................. 10

Federal Rule of Civil Procedure Rule 54 ...................................................................... 7

Federal Rule of Civil Procedure Rule 59(b) .................................................................. 9

Federal Rule of Civil Procedure Rule 59, 60 .............................................................. 11

Federal Rule of Civil Procedure Rule 60(b)(2) ............................................................. 8

1500424.1

Federal Rules of Civil Procedure 60(a) and/or 60(b)(6)……………………………… 1

**OTHER**

Central District Local Rule 5-4.5...................................................................................17

Federal Rule of Appellate Procedure 4(a)(5) ................................................................8

Palm Springs Municipal Code section 93.23.19............................................................7

WOODRUFF, SPRADLIN & SMART ATTORNEYS AT LAW COSTA MESA

1500424.1

# MEMORANDUM OF POINTS AND AUTHORITIES

## 1.

### *Introduction*

Intervention911 (hereinafter referred to as "911" or "plaintiff") expressly agrees that the judgment, in its current state, must to be corrected because it denies the City recovery of its costs without the required statement of the grounds therefor. Good cause therefore exists to revise that one portion of the judgment. Therefore, the primary dispute is not **whether** that portion of the judgment should be rewritten, but merely **how** it should be revised.

911 contends that, of the recognized exceptions for denying a prevailing party the costs to which it is presumptively entitled as a matter of law, the only ones that could theoretically apply are (1) "inequity" (really meaning "poverty," the way 911 presents it), and (2) "important civil rights case[s]" of the "gravest public importance" where costs are "extraordinarily high" (all three factors must be present). (*Association of Mexican-American Educators v. State of California*, 231 F.3rd 572, 593 (9th Cir. 2000); *Stanley v. University of Southern California*, 178 F.3rd 1069, 1079 (9th Cir. 1999)) However, characteristically, 911 submits no actual evidence of its supposed indigence,[1] leaving the only true dispute as whether this is an "important civil rights case" of the "gravest public importance," involving "extraordinarily high" costs. The City submits that 911 has not made a competent showing that this case so qualifies and, therefore, not only should the judgment be revised, but the revision should award the City its full recoverable costs of $52,962.86.

---

[1] Of course, 911's claims all through this case have been that the trespassing businesses are profitable and that 911 sold the buildings for millions. Therefore, it is hard to understand the plea of poverty from 911 now.

1500424.1

**2.**

***911's Argument re Municipal Code Section 93.23.19 Is a Non-Sequitur, and Manifestly Wrong on Multiple Grounds***

Before addressing the actual challenges to the City's right to costs, 911 makes a strange argument regarding a new Palm Springs zoning category that is seemingly disconnected from the Rule 54 issues herein; nevertheless, that argument compels response.

In January of 2019, the City passed an ordinance creating *Municipal Code* section 93.23.19, called "Transitional and Supportive Housing," effective January 1, 2020. 911 argues the passage of this law somehow, without trial or other factual determination, rendered **911** the prevailing party on its declaratory relief claims. Even if that were true (it is not), it does not affect 911's standing to advance that argument and, therefore, is of no aid to 911. That Municipal Code section states, in its entirety:

> "A. Use and Zoning. Transitional housing and supportive housing shall be considered a residential use of property, and shall be subject only to those restrictions that apply to other residential dwellings of the same type in the same zone.
>
> "B. Definitions. For the purposes of this section, certain words or phrases used in this section are defined as follows:
>
> > "1. 'Supportive housing' means housing with no limit on length of stay, that is occupied by the target population, and that is linked to an onsite or offsite service that assists the supportive housing resident in retaining the housing, improving his or her health status, and maximizing his or her ability to live and, when possible, work in the community.
> >
> > "2. 'Transitional housing' means buildings configured as rental housing developments, but operated under program requirements that require the termination of assistance and recirculating of the assisted unit to another eligible program recipient at a predetermined future point in time that shall be no less than six months from the beginning of the assistance."

7

There are multiple problems with 911's argument on this issue.

First, the dispute in this case was whether the alleged sober living units were actually treatment facilities. As presented in this case by 911, their businesses were neither "supportive" nor "transitional" housing, because:

- A. Supportive Housing must be "linked to an onsite or offsite service that assists the supportive housing resident in retaining the housing." There was no such allegation that 911's housing was so linked. Saying residents must go to an AA or comparable meeting program of their choice, and actually linking a specific program to the housing are two different things;
- B. Transitional Housing must "require the termination of assistance and recirculating of the assisted unit to another eligible program recipient at a predetermined future point in time." Again, there was no such progression required as part of 911's business; and
- C. If the City is right that these 911 businesses were actually treatment facilities, then State law governing licensing of them could not be overruled by this *Municipal Code* section.

In summary, and as addressed more specifically below, 911 cannot change the very definition of their business 7+ years after the discrimination they claim occurred. Furthermore, and more importantly, the above observations require factual determinations of existing disputes by a Court or jury; but this Court has already found that 911 has no standing to raise those, or any other, factual issues in this case.

Second, the passage of Palm Springs's new *Municipal Code* section is also not germane to the determination of the City's right to costs. The legal deadlines for 911 to argue a change in the law that would affect the outcome of the Court's April, 2020, rulings have long passed. The time to appeal is only 30 days and, at most, can be extended 30 more days, but only if such an extension is requested within 30 days of the passing of the original 30-day limit. Those deadlines have both lapsed. (*Federal*

8

*Rule of Appellate Procedure* 4(a)(5)) 911 could try to make a motion to vacate under *Federal Rule of Civil Procedure* 60(b)(2) for "newly discovered evidence that, with reasonable diligence, **could not have been discovered** in time to move for a new trial under Rule 59(b)." (Emphasis added.) Such an argument is untenable. First, a change in law is not new **evidence**. Secondly, even if it were, the new law is a matter of public record, having been passed and gone into effect well before the Court's April, 2020, rulings. As such, it **could and should have been discovered** during the now-lapsed timeframe.

Third, 911's Complaint challenges the City's intent and conduct in 2012-2013. To win, it must prove the City's conduct and **intent at that time** was improper. A statement of intent, enactment, or policy in 2019-2020 does not retroactively transmute reasonable, unintentional, non-discriminatory conduct of in 2012 into an intentional, unreasonable, and discriminatory policy. The decisionmakers of 2013 cannot be charged with knowledge of laws to be passed 6 years thereafter. That smacks of *ex post facto* laws in the criminal context --- both involve punishment for retroactively characterized conduct. The policy and conduct in 2012-2013 is still reasonable (as this Court found herein before the first trial) and non-discriminatory, even as another course of conduct and policy may be unreasonable today. There is more than one reasonable, nondiscriminatory way to classify a sober living facility.

Fourth, it would have been a question of fact for a future jury whether a given facility is either "transitional" or "supportive" housing at all, and particularly whether sober living facilities, operated as 911 used to operate them, are such, as opposed to treatment facilities or even a fourth, undefined category. Even then, measuring 911's 2012 operation of these facilities against a 2020 law is, at best, a purely academic exercise. Even if the new ordinance could somehow have an effect, the nature and extent thereof is still a question which would have to be adjudicated **and only by one has standing** before judgment to present that issue. 911 cannot simply say, "The Ordinance must be interpreted as including sober living facilities because I say it

1500424.1

1   should be," or that "these properties are sober living facilities thereunder (as opposed
2   to treatment facilities) because I say so"; and "in either case, the City cannot disagree
3   with me. Ergo, I win the case." Simply stated, that is not the way it works.

4       Fifth, the Complaint seeks relief for unreasonable and discriminatory conduct
5   occurring under the law as it was in 2012-2013, which indisputably did not change
6   through 2019, and arguably still has not. To now shift to apply a disputed 2020
7   standard to 2012-2013 conduct is profoundly unfair, changes the entire core of the
8   litigation, and makes pointless and wasteful all the work in this case heretofore.

9       It is true that the Court has power to award declaratory relief even it "that relief
10  was not requested in the complaint." (*Vietnam Veterans of America. v. C.I.A.*, 288
11  F.R.D. 192, 202-203 (N.D.Cal. 2012), citing *Arley v. United Pacific Insurance Co.,*
12  379 F.2nd 183, 186-187 (9th Cir.1967)) But, that said, the purpose of a Complaint still
13  remains to be sufficiently precise to give notice of claims asserted. (See, *e.g.*, *Smith v.*
14  *International Longshoremen's Association*, 592 F.2nd 225, 226 (4th Cir.1979); Rule
15  8(a, e)) Therefore, just because a Court has the **power** to craft some declaratory relief
16  based on section 93.23.19 does not mean that the passage of that law merits a finding
17  that 911 **has standing**; furthermore, in this case, the Court craft that relief without
18  abusing its discretion, given the questions of fact involved, as pointed out, *supra*.

19      But again, first and foremost, this debate is mooted by 911's trespasser status
20  which eviscerates standing and, thus, 911's ability to prosecute this case at all. Before
21  the bench trial in this case occurred in November of 2018, the City submitted a
22  supplemental brief (Docket No. 475) which included the following September 27,
23  2018, testimony from Cardenas Three's person most knowledgeable:

24      "Q.  Does Cardenas currently collect any kind of rent for the occupants in those properties?
25      "A.  No.
26      "Q.  Is there any kind of a lease agreement that you're aware of between Cardenas and Intervention or anyone living at the Palm Canyon or Alexander Properties?
28      "A.  No.

10

1500424.1

"Q. What is – what is Cardenas planning to do with these properties?
"A. We plan to sell them.
"Q. What are your intentions with regard to the people that are currently occupying the property?
"A. Can you repeat the question?
"Q. Sure. Basically, are you planning to let them stay or what's the plan?
"A. We're planning on selling the property as soon as possible.
"Q. Are you aware of any documents that would give these folks the right to stay there?
"A. No.
"Q. And by 'there,' I mean both [The Palm Tee] and [The Alexander].
"A. No. I am not aware of any documents." (Docket No. 475-4, p. 71-72, citing N. Long Deposition, 70:25-71:23)

Since, based on the above testimony, 911 was a trespasser as early as September of 2018, it still was one in January, 2020, when section 93.23.19 went into effect. Accordingly, the lack of standing the Court found extends back to before this ordinance was passed; that lack of standing remains fatal to **any** argument 911 claims it could have brought on any basis, whether under Rule 59, 60, or otherwise.

Finally, 911 also lost this case due to a failure to prosecute, an issue wholly unaffected by section 93.23.19. Therefore, even if new law could somehow confer standing on 911, loss on failure to prosecute still warrants awarding the City its costs.

### 3.

### *There Is no "Inequity" in Awarding the City its Costs*

The parties do not dispute the basic foundation of the City's motion – namely that the Court has discretion to deny the City its costs, but only if it provides an appropriate basis. One recognized basis for denying a prevailing defendant its costs is inequity. (*Andretti v. Borla Performance Industrias, Inc.*, 426 F.3rd 824, 836 (6th Cir. 2005)

*Andretti*, the sole case 911 cites on this general principal, involved a defendant who "agreed from the beginning of th[e] litigation to an injunction from using Andretti's quotation in … future advertisements," but Andretti's "demand for

1 damages" merely prevented settlement; therefore, the court did not abuse its discretion by concluding Andretti's loss on damages was a victory for the defense. (*Id*.) That bears no resemblance to this case factually or procedurally.

911's sole cited "inequity" is that the City "changed its position to do exactly what Plaintiff asked for from the outset of the case." That simply is false. As already stated, 911 never asked for such a zoning category, and there is nothing to guarantee that the new zoning categories (a) apply at all, (b) exempt 911 from the CUPs it hoped to avoid, or (c) have any effect on the fire sprinklers, which were required under the *California Building Code*, not the *Palm Springs Municipal Code*.

There are few published cases within the 9th Circuit on this topic, but one is *Coulter v. Newmont Gold Co.*, 873 F.Supp. 394 (D.Nev. 1994). Coulter unsuccessfully brought a discrimination action under Title VII. (*Id*. at 395) The Court found that awarding Newmont its costs would be inequitable, primarily due to her lack of means, the potential public value of the case (as opposed to a diversity tort action), and the merit of the case she unsuccessfully prosecuted. (*Id*. at 397) The Court thus lumped several other grounds for relief under a general "inequity" analysis.

In doing so, however, the Court heavily relied upon *Braxton v. United Parcel Service, Inc.*, 148 F.R.D. 527, 528-529 (E.D.Pa. 1993), a "heavily litigated" discrimination action. *Braxton* noted, "Equitable factors in such cases do not readily lend themselves to formulae, and thus courts can be forgiven for sometimes lapsing into circular generalizations in deciding issues like this ... The inequity we seek to avoid here stems from the disparity of resources" *vis-à-vis* an award of "astronomical costs" that could chill future litigants. The costs in *Braxton* were $16,805.79, just under a third of the City's claimed $52,962.86. In this case, not only was Braxton was an individual instead of a corporate entity, but the costs herein are less than 2% of what 911 asked of the jury at trial. (*Braxton*, *supra*, at 529)

911 has the burden to establish inequity. (*Coulter*, *supra*) 911 presents **nothing**

1500424.1

to support its claim of "indigence"[2], save for a reference to its concurrent litigation over what it contends was a fraud committed by the subject properties' purchaser, Zenith.[3] (Docket No. 550, 4:7-19) As this Court is aware, 911 did not sell the properties to Zenith (since 911 did not own them at the time). 911 has not owned those properties since June of 2014, when it transferred title to two trusts in their principals' names. Accordingly, to the extent Zenith harmed anyone, it was not 911.

The only other cited grounds for inequity are incomprehensibly nebulous: "the situation here and the nature of the dismissal." (Docket No. 550, 4:3-4) To the extent that 911 is citing the fact that it lost based on lack of standing and failure to prosecute, it is unclear that those grounds affect the comparative equities. That 911 self-destructed is not a basis for denying the City its costs, the majority of which were incurred before the first trial in August of 2016. If anything, equities in this situation militate in the other direction, in that the City has been forced to defend this heavily litigated case only to have 911 throw it away through a combination of misrepresentations, counsel abuse, delay, and inaction. 911 cannot now claim it is inequitable to hold it responsible for draining the City's time and resources in a case it did not value enough to prosecute, involving properties it has not owned since 2014.

**4.**

*This Case Does not Fit the Definition of an "Important" Civil Rights Case for Purposes of Denying the Prevailing Party its Presumptive Costs*

Substantively, this case was about decisions the City made on April 3, 2013 -

---

[2]   Indeed, to there is any economic status evidence, it is that in 2012/2013, 911 was charging each of its residents at least $2,600.00 a month. 911, itself, has paid no mortgage or property taxes, since it ceased owning the properties in June of 2014. Therefore, it has had six years of income (and presumably increasing rents) unburdened by normal overhead and, therefore, 911 should have the resources to pay the City.

[3]   911, or whoever the seller was, apparently still holds the original purchase price it was paid, which was in seven figures.

13

1500424.1

1  one to require 911's facilities to obtain conditional use permits under *Zoning Code*,
2  and separate simultaneous decisions that these properties must upgrade their fire
3  protection systems under the *California Building Code*. 911 never alleged that the
4  subject laws were **facially** discriminatory, but only that discriminatory **motive** was a
5  factor in how the City **applied** them.

6  Nothing about this fact pattern suggests that this was a civil rights case of any
7  significant import, let alone "the gravest public import." It is difficult to conceive of a
8  precedent this case could have set on the merits that would have had any wide-ranging
9  application. Critically, 911, who has the burden, does not even attempt to posit one.
10 The jury would have decided either that the particular City employees involved in
11 these particular decisions were improperly biased, or they were not (indeed, the
12 evidence of the latter was overwhelming).

13 As recently as this month, the 9th Circuit affirmed that a City has a compelling
14 interest in applying its zoning laws to addiction recovery facilities. In *SoCal Recovery,*
15 *LLC, et al., v. City of Costa Mesa*, No. 19-56077, 2020 WL 3057517, at *1 (9th Cir.,
16 June 9, 2020), the plaintiff sober living facilities unsuccessfully sought a preliminary
17 injunction exempting them from certain Costa Mesa's zoning laws. On appeal, the 9th
18 Circuit found no abuse of discretion, because, although the facilities had legitimate
19 interests in operating their businesses, the City had "significant countervailing
20 interests that weighed against a grant of relief to the plaintiffs, including the interests
21 of the City in enforcing its ordinances and of the residents of sober living homes and
22 the public at large in preserving the benefits the City ordinances conferred."

23 Not only is the existence of these interests uncontroversial, there has never been
24 a dispute in this case that the City had the right to advance those interests. There was
25 also no claim by the City that it could intentionally discriminate when applying those
26 laws. The only question was whether the City had done so.

27 As the City already stated in its moving papers, the *Association of Mexican-*
28 *American Educators* case involved issues said to "affect[] tens of thousands of

14

1500424.1

Californians and the state's public school system as a whole." (*Association*, *supra*) In the *Stanley* case, the 9th Circuit also found the plaintiff had "raise[d] important issues." (*Stanley*, *supra* at 1080) Those issues included sexual discrimination (specifically unequal pay) in athletics violating FEHA, Title IX, and the California Constitution, *inter alia*. Such issues could easily be extrapolated to the entire California workforce.

Other examples of qualifying important civil rights actions include "[i]ndividual Eighth Amendment cases [which] are important for safeguarding the rights and safety of prisoners." (*Draper v. Rosario*, 836 F.3rd 1072, 1088 (9th Cir. 2016)) Another case where this exception was applied was "a significant case involving the disparate impact of English-only proficiency tests in the workplace on employees who the employer knew to have limited English language skills." (*Rivera v. NIBCO*, 701 F.Supp.2nd 1135, 1142 (E.D.Cal. 2010)) Another involved use of deadly force by police against a mentally ill person. (See, *Knox v. City of Fresno*, 208 F.Supp.3rd 1114, 1116 (E.D.Cal. 2016)) Still another involved proper handling and treatment of prisoners with infectious diseases. (See, *Vasquez v. Davis*, 226 F.Supp.3rd 1189, 1225, fn. 23 (D.Colo. 2016), aff'd in part, vacated in part on other grounds, 882 F.3rd 1270 (10th Cir. 2018))

All of these cases dealt with issues of import with farther reaching ramifications than this one. Whether the City had acted with discriminatory intent towards 911's facilities is limited to the particular facts of this case. It is unclear how a ruling on the merits in this action could have affected the zoning of other facilities in other locales, or even within Palm Springs, itself. Even then, there is no nexus between the civil rights issues and the ultimate resolution of the case, which was on two unrelated grounds – lack of standing and failure to prosecute. As such, any precedent that would or could be set herein inures to those issues, not civil rights.

There are also a number of cases across various circuits which militate against denying a prevailing defendant its costs merely because the case involved civil rights. In its moving papers the City cited to *English v. Colorado Department of Corrections*,

15

1500424.1

1  248 F.3rd 1002, 1013 (10th Cir. 2001), which noted a "civil rights plaintiff is not
2  entitled to heightened protection from taxation of costs." *English*, itself, relied on an
3  earlier precedent which decided it would "uphold the traditional presumption in favor
4  of awarding costs, regardless of whether the prevailing party is a defendant in a civil
5  rights case." (*Mitchell v. City of Moore, Oklahoma*, 218 F.3rd 1190, 1204 (10th Cir.
6  2000)) *Mitchell*, in turn, premised its ruling on "persuasive" authority from *Cherry v.
7  Champion International Corp.*, 186 F.3rd 442, 448 (4th Cir. 1999). Even the United
8  States Supreme Court observed that it assumes district courts "deny[ ] costs to the
9  prevailing party only when there would be an element of injustice in a cost award."
10 (*Delta Air Lines, Inc. v. Aug.*, 450 U.S. 346, 355, fn. 14 (1981))

11 911 may find having to pay the City its costs undesirable, but the imposition of
12 this presumptively standard remedy would hardly be unjust.

### 5.
### *The Costs Claimed Are not Unreasonable*

15 911 attempts to challenge the amount of the City's costs, but again, the
16 substance on this argument is lacking.

17 For example, 911 argues that "various persons were subpoenaed without
18 explanation as to their basis." (Docket No. 550, 6:15-16) It is impossible to know
19 which subpoena targets are being challenged here, since 911 does not specify, but,
20 rather, merely makes the broad brush and unsupported claim. The City's subpoenaed
21 witnesses mostly included 911 residents and employees (past and present), and a
22 representative of Cardenas Three. The City also noticed the depositions of 911's two
23 principals. The rest of the depositions were taken by 911, and therefore, beyond the
24 control of the City. These included numerous City employees (past and present) and
25 two State employees who were involved in post-classification investigations of the
26 subject facilities.

27 911's handful of specific arguments are easily dispatched.

28 911 takes issue with ordering a transcript from the State proceedings between it,

1500424.1

Cardenas Three, and others. (A-73-74) Specifically, the transcript was of the January 9, 2019, hearing on Cardenas Three's motion to expunge *lis pendens*, a critical juncture in that proceeding wherein the Court found plaintiffs did not have a reasonable likelihood of success – a key fact which supported the City's (ultimately successful) contention that 911 lacked standing. 911 raised the issue initially, and should not be heard to criticize the City for gathering evidence in its defense.

911 contests shipping charges associated with the deposition of **911**'s retained expert, Andrew Wainwright. (A-102) As 911 knowns, Mr. Wainwright was deposed in Oakdale, Minnesota, because 911 would not agree to produce him in California without imposing great cost on the City. The shipping costs were thus a consequence of the location of the deposition, and were incurred because of conduct of 911.

911 argues against expediting charges, conference rooms, handling fees for the deposition of David Sheridan (a witness designated by 911 to discuss the Sober Living Network; he testified at the first trial re same) for 911. The deposition was taken June 28, 2016, with just over a month before trial was set to commence on August 2, 2016. The transcript thus had to be expedited in order for the City to file a motion *in limine* related to that testimony, which it did on June 15, 2016. (Docket No. 248)

Finally, 911 takes issue with the costs for chambers copies of filings, even though those copies were mandated by Central District Local Rule 5-4.5, "Mandatory Chambers Copies." As such, these mandated copies can hardly be considered unnecessary or improper.

No other specific criticisms are raised and, as such, the City contends that 911 has conceded the propriety of the remaining claimed costs.

### 6.

### *Conclusion*

911 casts itself as a civil rights crusader, but that is not borne out by case history, of which the Court is well aware. 911's primary motive throughout this expensive 7+ case has been to profit off the disabled, not benefit for them. Rather than

1500424.1

obtain permits and buy inexpensive life-saving sprinklers, it has tried to win, by hook and by crook. It repeatedly prevaricated about owning the facilities which it had alienated in 2014. It instructed its employees to conceal its treatment activities from the City, and to refuse entry to State investigators. It tried to partner with a now defunct company which the F.B.I. found to have been systematic abusers of the disabled. It showered personal abuse on its disabled clients, defense counsel, and even its own attorneys to the point that they withdrew. Meanwhile, since summer of 2018, it has occupied the subject facilities as a trespasser, unburdened by having to pay rent, mortgage, property insurance, or property tax.

An important civil rights case is one where a plaintiff raises issues that potentially affect many, albeit perhaps unsuccessfully. 911 has only ever been in this for itself. It should not, therefore, be exempted from liability for the $52,962.86 in recoverable costs it deliberately and deceitfully caused the City to incur.

Dated: June 24, 2020                WOODRUFF, SPRADLIN & SMART, APC

                                    By: */s Robert L. Kaufman*
                                        ROBERT L. KAUFMAN
                                        DOUGLAS J. LIEF
                                        Attorneys for Defendant CITY OF PALM SPRINGS, a public entity

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF ORANGE

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF, SPRADLIN & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On June 24, 2020, I served the foregoing document(s) described as **CITY OF PALM SPRINGS' REPLY IN SUPPORT OF MOTION TO PARTIALLY VACATE/MODIFY JUDGMENT PURSUANT TO *FEDERAL RULE OF CIVIL PROCEDURE* 60(A) AND/OR 60(B)(6)**

☐  by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐  **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of WOODRUFF, SPRADLIN & SMART for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒  **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☐  **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _____ to receive said documents, with delivery fees provided for. I am readily familiar with the practices of WOODRUFF, SPRADLIN & SMART for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by _____ on said date in the ordinary course of business.

☐  **(BY FACSIMILE)** I caused the above-referenced document to be transmitted to the interested parties via facsimile transmission to the fax number(s) as stated on the attached service list.

☒  (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on June 24, 2020, at Costa Mesa, California.

/s/
Shelly Steeber

1500424.1

**INTERVENTION911, et al. v. CITY OF PALM SPRINGS, et al.**

**ASSIGNED TO HON. OTIS D. WRIGHT, II
COURTROOM 11
MAGISTRATE JUDGE SHERI PYM
COURTROOM 3**

**USDC, CENTRAL DISTRICT OF CALIFORNIA
CASE NO. EDCV13-01117 MMM (OPx)**

**SERVICE LIST**

| | |
|---|---|
| Thomas N. Fitzgibbon<br>Apex Law APC<br>100 Wilshire Boulevard, Suite 700<br>Santa Monica, CA 90401<br>Tel: (310) 230-5280<br>Fax: (310) 496-3175<br>Email: tom@apexlaw.com | Attorneys for Plaintiffs<br>**INTERVENTION911, a California corporation** |

1500424.1